2013 VT 29

# Michael Hanson-Metayer v. Elizabeth Hanson-Metayer

[70 A.3d 1036]

No. 12-212

Present: Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Gerety, Supr. J., Specially Assigned

Opinion Filed April 12, 2013

492

*Kurt M. Hughes* of *Murdoch, Hughes & Twarog, P.C.*, Burlington, for Plaintiff-Appellee.

*Susan M. Murray* and *Michele B. Patton* of *Langrock Sperry & Wool, LLP*, Burlington, for Defendant-Appellant.

¶ 1. **Dooley, J.** Appellant/defendant Elizabeth Hanson-Metayer [wife] appeals the decision of the superior court in the divorce between her and appellee/plaintiff, Michael Hanson-Metayer [husband]. She claims that the court committed error by: (1) making findings not supported by evidence; (2) questioning the parties without swearing them in; (3) changing its findings of fact from those announced in an oral decision on the record; (4) weighing the statutory factors in making its custody decision; (5) awarding the marital home to husband; (6) inequitably dividing the personal property; and (7) awarding attorney's fees to husband. Because the superior court's custody decision was supported by the evidence and the irregularities were harmless, we affirm that part of the decision. We reverse and remand, however, as to the division of the marital property and the attorney's fees.

I.

¶ 2. The following discussion is mainly of the proceedings in the superior court. In general, the facts as found by the superior court, and some of the evidence relating to those facts, are discussed in the body of this decision.

¶ 3. Wife and husband were married in 2007, after the birth of their one child — a daughter — in 2006. They purchased a condominium in South Burlington in 2008, and resided there from that date until wife moved to Washington, D.C. in August 2011.

¶ 4. During their marriage, wife obtained a degree from Johnson State College, completed in May 2011, and planned to attend

law school. At various points, each party served as the primary caregiver of the child. Husband agreed in principle to wife's plan to attend law school, but did not agree to wife's plan to move to Washington, D.C. to do so. He wished instead for her to attend Vermont Law School, so that he could continue working in Vermont and the couple would have the benefit of their families nearby to support them. These initial discussions assumed they would remain together as a couple.

¶ 5. In May 2011, wife left the home with the child and sought a Relief from Abuse (RFA) order evicting husband from the home and prohibiting contact between husband and her and the child. The court issued an ex-parte RFA order, scheduling a hearing two weeks later. The hearing was not held at that time because wife requested appointment of a guardian ad litem and an attorney for the child. The court did, however, authorize husband to have supervised visitation with the child. Husband filed for divorce on May 20, 2011, and the RFA case was consolidated with the divorce action.

¶ 6. The hearing before the family division of the superior court took place on July 14, 2011. At the hearing, some evidence was taken by the court, but a full evidentiary hearing did not take place because of the lack of time available to the court. Wife's petition for a final RFA order was dismissed, but a temporary custody order in favor of wife was issued in August. That order awarded wife primary legal and physical rights and responsibilities and granted her permission to relocate with the child to Washington, D.C. It set up a visiting schedule for husband for both the time before wife left for law school and the time after she relocated.

¶ 7. Wife left Vermont in early August 2011 for Washington, D.C. Husband then filed a motion to reopen the evidence and requested that the court establish a specific parent-child contact schedule. A hearing was held on September 19, 2011 that resulted in a modified schedule that doubled husband's parent-child contacts and allowed for telephone and/or Skype communication. An evidentiary merits hearing was held on January 2, 2012, at the end of which the trial court made oral findings and an order granting primary parental rights and responsibilities to husband. Wife immediately filed for a motion to stay execution of the order pending appeal, which was denied by the superior court. On January 4, she filed an appeal of that motion to a single justice

of the Supreme Court, as well as an appeal of the disposition of the case. The motion to stay was denied, and the appeal was withdrawn on February 13, 2012 and dismissed on February 28, 2012.

¶ 8. After an additional evidentiary hearing on March 2, 2012, where issues of division of property and some clarification of the parent-child contact schedule were taken up, the trial court issued its written findings and decision on June 4, 2012. These findings also covered the custody and parent-child contact issues that were the subject of the oral findings. They included an analysis of the statutory factors provided by 15 V.S.A. § 665 that was more favorable to husband than the oral findings had been. The court reaffirmed the award of primary parental rights and responsibilities to husband.

¶ 9. The June decision also divided the marital property, apparently attempting to do so equitably and in accordance with the wishes of the parties. It noted that "[f]rom a financial point of view, there is little at stake except for the division of debts." Insofar as they are in dispute, the details of the division will be discussed below.

¶ 10. Wife appealed from the custody decision, the property division decisions and the award of attorney's fees to husband.

## II.

¶ 11. Wife makes a number of arguments about the trial court's findings and analysis that led to the custody decision: (1) that the trial court found facts that were not supported by the record;[1] and (2) that the trial court improperly analyzed three of the statutory factors that must be considered in rendering a custody decision. See 15 V.S.A. § 665(b). All these arguments combine into one: that the trial court's custody decision was not supported by the evidence or the findings.

¶ 12. When considering the trial court's analysis and decision in awarding parental rights and responsibilities, this Court applies a highly deferential standard of review. See *Knutsen v. Cegalis*, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059 (mem.); *Payrits v. Payrits*, 171 Vt. 50, 53, 757 A.2d 469, 472 (2000) ("Given its unique position

---

[1] She also points out some findings that were not in the record related to the division of property and the attorney's fees, which will be addressed in the next section.

to assess the credibility of witnesses and weigh the evidence, we will not set aside the [trial] court's findings if supported by the evidence, nor its conclusions if supported by the findings." (quotation omitted)). "In the highly fact-intensive context of a custody determination, we rely on the family court's determinations of fact and evaluations of credibility." *Chickanosky v. Chickanosky*, 2011 VT 110, ¶ 14, 190 Vt. 435, 35 A.3d 132. Therefore, "[t]he findings will stand if any reasonable and credible evidence supports them." *Id.* Although appellant "would rely on different evidence, interpret the evidence differently, or offer new evidence . . . on appeal, these are not grounds for reversal." *Knutsen*, 2011 VT 128, ¶ 13.

¶ 13. In awarding parental rights to the husband, the superior court considered each factor included in 15 V.S.A. § 665 in its analysis. Wife challenges the court's conclusion on three of the factors, and for each some of the supporting findings.

¶ 14. First, wife challenges the court's conclusion as to the fourth statutory factor: "the quality of the child's adjustment to the child's present housing, school and community and the potential effect of any change." 15 V.S.A. § 665(b)(4). The court found this factor weighed in favor of husband. Prior to the move, the child had spent most of her life in Vermont and had done quite well as a student at a Montessori school and was generally regarded as an intelligent, personable child, well adapted to her educational environment. The court found she "significantly benefited from the close availability of both grandparents and other family members." Wife testified that the child is doing very well in her new school in Washington and that she is adjusting well. The court found, however, that there was no corroborating evidence from the educational system on this point. In contrast, there was substantial independent evidence of her performance in the Vermont school.

¶ 15. The court addressed under this factor the extent to which each parent did, or would, spend time with the child. The court noted that the demands of wife's law school studies meant that the child was often with others. It found that the only family support in Washington came from wife's sister, who was a senior in college and — the court noted in the findings — was undecided on remaining in Washington after graduation. It also found that wife received some support from her mother, who had taken time off from her job "on a couple of occasions for two to three weeks in order to help her daughter." Wife also testified that the child

spends a significant amount in time in daycare. The court also factored in that the child has the benefit of the availability of her grandparents and other family members in Vermont.

■ ¶ 16. Wife's first claim is that the court improperly interpreted § 665(b)(4) to create a comparison between the housing, school, and community in Maryland and those elements in Vermont. Her argument is that her "present" living arrangement is in Maryland, not Vermont, so the factor requires the living arrangement in Maryland to be assessed, along with the disruption of a move. The statutory factors necessarily involve a comparison, *Bissonette v. Gambrel*, 152 Vt. 67, 69, 564 A.2d 600, 601 (1989), and the court did not err in viewing it so.

■ ¶ 17. Nor did the court err in its findings and its conclusion on this factor such that we could reverse its custody decision. The evidence supported its conclusion that the support system and educational environment was stronger in Vermont than in Maryland,[2] even though the support system in Maryland was temporarily aided by the visits of wife's mother. The court could give less weight to wife's statement that the child was doing well in her educational environment absent neutral evidence to this effect.

¶ 18. To some degree the competing claims of the parties have emphasized the amount of time the child would be in a daycare center in each location. The court found that the child was spending "a great deal of time in a daycare due in large part to her mother's obligations as a law student." Mother contests this finding and argues that the child will spend more time in daycare in Vermont because the father works a normal forty-hour week. The evidence is ambiguous on these points. Mother uses a before-school care program on some days so she can get to law school early. On Tuesday and Thursday, she uses an afterschool care program that includes lessons in martial arts, French and violin. On these days, she does not pick up the child until 7 p.m. Husband testified to the afterschool care program in South Burlington and testified he would use it, picking the child up after work at 5 p.m. He also testified to the availability of care by his parents on a short-term basis. The court also found that husband

---

[2] It is clear that the child would have had to change schools in Vermont. Husband had investigated the public elementary school in South Burlington and testified to her opportunities there. Otherwise, the evidence mostly related to the child's history in the Montessori school.

"is able to adjust his work schedule in order to spend as much time as is reasonably possible with [the child]. . . . He has a long history of doing so." We cannot resolve the daycare dispute as a matter of law. There were conflicting inferences to be drawn from the evidence, and the court acted within its discretion in making the findings it did.

¶ 19. The second factor that mother asserts was improperly analyzed is the sixth statutory factor: "the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development." 15 V.S.A. § 665(b)(6). The court found — even though the evidence suggests that wife has spent more time as the primary caregiver — that the criterion is evenly weighted between the parties. Each of the parties is devoted to the child, and the child responds well to both of them. The evidence supports that wife, at times, was the primary caregiver and that husband, at times, was the primary caregiver — depending on whether husband was working and whether wife was in school.

¶ 20. Wife challenges the court's conclusion that this factor is neutral and argues that it should have been assigned great weight in her favor. Husband, in turn, argues that the evidence supports the court's conclusion. While they were an intact family, both parents were active as caregivers. Each was the primary caregiver for a period of time, depending upon their employment and wife's school attendance; the evidence shows that the period for wife was longer than for husband. "We have not enunciated a definitive standard for determining the identity of the primary-care-provider under § 665(b)(6)." *Nickerson v. Nickerson*, 158 Vt. 85, 89, 605 A.2d 1331, 1333 (1992). As we noted in *Payrits*, 171 Vt. at 54, 757 A.2d at 473, there can be periods in which both parents are primary caregivers or in which neither is the primary caregiver. To some degree, this characterization matches the facts in this case.

¶ 21. As wife argues, we have held that this factor is entitled to great weight. *Harris v. Harris*, 149 Vt. 410, 418, 546 A.2d 208, 214 (1988). The weight, however, depends upon evidence "of the likely effect of the change of custodian on the child." *Id.* at 419, 546 A.2d at 214. Only where there is no evidence of that effect should the court ordinarily find that the child must remain with the primary custodian. *Habecker v. Giard*, 2003 VT 18, ¶ 14,

175 Vt. 489, 820 A.2d 215 (mem.). Here, because of the active parenting of both husband and wife, the evidence of the environment in Vermont, and father's effort to keep physical contact with the child, the court could determine the likely effect of the change of custodian. We find no reversible error in the treatment of this factor.

¶ 22. In our view, the most significant factor in the court's decision is the fifth factor: "the ability and disposition of each parent to foster a positive relationship and frequent and continuing contact with the other parent, including physical contact, except where contact will result in harm to the child or to a parent." 15 V.S.A. § 665(b)(5). The court found that wife has demonstrated a longstanding pattern of conduct designed to exclude husband from interaction and parent-child contact. The court concluded that husband "would foster a continuing relationship between [the child] and her mother." The court found this factor "is strongly weighted" in favor of husband. The court's decision goes through a number of events on which the conclusion is based. Many are challenged by wife and discussed below. The court found that wife's "unjustified behavior is symptomatic of her mental illness, including depression, anorexia and posttraumatic stress disorder." It went through wife's mental health history and her history of violent acts[3] and concluded:

> Based on the above findings, the [c]ourt concludes that even though [wife] represents that she is engaged in mental health counseling, she remains at risk to suffer psychological meltdowns resulting in assaultive behavior, towards other individuals and herself. Clearly, she suffers from emotional and mental instability. Given [wife's] long history of mental and physical volatility, it is unlikely that she will obtain stability in the near future. Furthemore, it is highly probable that [wife] would continue her efforts to alienate [the child] from her father and to prevent [father][4] from engaging in meaningful parent-child contact if she were to be awarded sole legal and physical parental rights and responsibilities.

---

[3] Father had also been violent at times, but his violence never involved the child and was less serious than that of wife.

[4] Text says "defendant," who is wife in this situation. It is obviously an error.

¶ 23. Wife challenges four findings of fact that the court used to reach its conclusion that she engaged in a campaign to deprive father of his relationship with the child. The first is an incident that the court found occurred shortly before Christmas 2010. The court found that wife left the home to go to a battered woman's shelter with the child and told husband that she was leaving for good, that he would not be allowed parent-child contact unless he paid her $800 per month, and that she would move to Washington with the child. Several days later, she returned because she was denied access to the shelter because she could not substantiate that father physically abused her. As wife argues, there was no evidence admitted in the merits hearing to support these findings. Husband included these allegations in a pretrial affidavit but did not testify to them at the merits hearing.[5] We agree that the finding is unsupported.

¶ 24. The second relates to the date wife left the parties' home to move to Maryland. The court found that she left on or about August 9, 2011, and that date was premature because she did not have to be at an orientation at law school until August 22. The testimony is inconclusive. Wife testified that she left on August 13; husband testified, without objection, that he was told it was August 9.[6] The evidence is not conclusive on the question.

¶ 25. The latter two findings relate to the visitation husband was allowed after the RFA order was issued. The decision states that husband was denied visitation for two weeks after the RFA was issued and then thereafter because at the RFA hearing wife obtained a continuance until a guardian ad litem and attorney for the child could be appointed. The renewed hearing did not occur until July. While there was a partial evidentiary hearing at that time, the evidence was not completed, and the result was a temporary order, issued in August. The court found that husband had only supervised parent-child contact until the temporary order was issued.

---

[5] The affidavit was prepared May 19, 2011 to accompany a motion for expedited temporary relief, filed after the RFA hearing was continued. Wife's lawyer stated at the oral argument that husband testified at the merits hearing that the incident had not occurred. We cannot find such testimony.

[6] Again, there is an affidavit, and the court may have relied upon it. In his affidavit, husband said he texted wife on August 12 to arrange a place for visitation pick-up that day and learned "she had moved already." He went on to say that wife "apparently left on Tuesday, August 9, 2011."

¶ 26. Wife claims that the findings on husband's visitation are erroneous. She claims that he had supervised visitation until the July hearing and unsupervised visitation thereafter. While wife's claims are basically correct, the court's findings on this matter clearly constituted a technical error — the section that wife refers to is confusing, but the court pronounced in its oral findings that "[a]t the point of the hearing on July 14th, the supervised visitation which had previously been ordered in the relief from abuse temporary order was changed so that plaintiff father was allowed to have unsupervised visitation." With respect to the contact after the July hearing, the order allowing only supervised contact was not modified until mid-August, but apparently wife allowed unsupervised contact up until she left for Washington with the child.[7]

¶ 27. Our standard on the effect of unsupported findings in custody cases is set out in *Lyddy v. Lyddy*, 173 Vt. 493, 496, 787 A.2d 506, 512 (2001) (mem.). In that case we affirmed a custody decision based on the following analysis: "For the most part, however, the findings are accurate and supported by the evidence, and to the extent that they are not, they were not controlling with respect to the court's ultimate decision to award custody to mother . . . ." See also *Rogers v. Parrish*, 2007 VT 35, ¶ 30, 181 Vt. 485, 923 A.2d 607 (quoting *Lyddy*, 173 Vt. at 496, 787 A.2d at 512). To apply this standard, we must look at the findings that are supported.

¶ 28. The court relied upon four specific incidents in reaching its conclusion that wife engaged in a pattern of conduct to exclude husband from interaction and contact with the child. The first is the December 2010 incident as described above. The second was an email that wife wrote to the child's school "in an effort to

---

[7] Husband testified to unsupervised contact at the merits hearing. We do not have a transcript of the July hearing so we do not know whether the court orally required unsupervised contact at that time. The docket entry indicates that there was an order on parent-child contact, but wife was to prepare a written order. It contains the cryptic entry that "Notice given on record." An entry on July 28 indicates that a hearing had been held on parental rights and responsibilities and parent-child contact but "no agreement reached by parties." Wife's lawyer filed a proposed custody and visitation order on August 4. The order was issued on August 19, and stated that husband could have parent-child contact "[u]ntil [wife] leaves for law school on Friday from 6 p.m. to Tuesday at 6 p.m. of each week." The written order was issued after wife left for law school so it had no effect on the visitation before she left.

exclude [husband] from participation in her education." In the email, wife told the teacher that husband refused to work together as a parenting team and that husband would not take time from work to attend parent-teacher conferences. The court found the statement to be false.

¶ 29. The next incident occurred in May, when wife left the home with the child and obtained an RFA based on allegations that husband had physically abused her and the child. Not knowing of the RFA petition, husband called wife and was told that wife had left for good and refused to disclose her location. When husband contacted the police to find the child, he was told of the RFA order. The court found that to obtain the order wife embellished "minor accidental injuries" suffered by the child. It further found that "there is no credible evidence that the plaintiff ever intentionally abused or physically harmed [the child]."

¶ 30. The final incident involved wife's leaving to move to Maryland. As stated above, the court found the move "premature[ ]." Wife gave no notice of her move, and husband could not establish contact with the child for several weeks. Wife refused to disclose her location or any contact information for the child. She refused to disclose the location of the school or discuss parent-child contact. She has been unnecessarily slow to provide educational information, unless specifically ordered by the court to do so.

¶ 31. As we discussed above, the court combined the incidents described above with wife's history of mental illness to find that wife would not change her behavior with respect to husband. It concluded that wife would work to "prevent the relationship between father and daughter."

■ ¶ 32. In our judgment the last two events were much more significant than the first incident. Even if we assume the court got wrong the date wife left for Maryland, the key findings that she left without notice and refused to provide information to allow parent-child contact are unchallenged.[8] Similarly, although the court made errors in describing the contents of the RFA order and husband's ability to visit the child, the significant parts of the RFA incident are unchallenged. We conclude that under the *Lyddy* standard we cannot reverse the court's custody decision

---

[8] Husband's affidavit indicated that he first learned wife had moved when he texted her on August 12 to arrange the pick-up place for the scheduled visitation.

because of the errors in the findings. The majority of the findings are correct, and the decision is not controlled by the erroneous findings.

¶ 33. Wife additionally challenges the court's reliance on the ex parte RFA order because there was no finding that wife acted in bad faith or that she knew or should have known that the accusations were groundless. She relies particularly on our decision in *Renaud v. Renaud*, 168 Vt. 306, 311, 721 A.2d 463, 467 (1998). We discussed in *Renaud* the consequence when a parent engages in conduct intended to poison the other parent's relationship with the child. We noted that one form of interference is "persistent allegations of physical or sexual abuse" that are untrue. *Id.* at 310, 721 A.2d at 466. We noted, however, there are limitations on using such allegations:

> The situation is more difficult where the allegations of abuse, although ultimately found to be baseless, may initially be in doubt. Society has a strong interest in encouraging parents to take action if they suspect that their child is being abused. Accordingly, courts should infer an ulterior motive in the filing of such charges only where a parent knew, or reasonably should have known, that they were groundless. Here, the court found that the factual support for mother's relief-from-abuse petitions was "weak at best," and that mother "imagined abuse where there was no abuse" because of her emotional distress and distrust of husband. The record amply supports these findings, but the findings do not indicate whether mother knew or reasonably should have known that the petitions were groundless.

*Id.* at 311, 721 A.2d at 467-68. We noted in *Renaud* that mother had consulted with the child's pediatrician and therapist before filing the RFA petition and, although each did not conclude there had been abuse, they were concerned about father's conduct. We concluded that the record did not show "that mother's purpose was to alienate the child from his father, or that her concerns were wholly unreasonable" and that her contacting experts showed her concerns "were not entirely unfounded and certainly warranted investigation." *Id.* at 312, 721 A.2d at 468.

¶ 34. We concur that the court here never found explicitly that wife "knew or reasonably should have known" that the RFA

petition was groundless. Wife did not raise the *Renaud* standard in the superior court or argue that it could not be met. In any event, we conclude that the findings the court did make were sufficient. The court went further than the court in *Renaud*, finding that there is no credible evidence of abuse. It also found that wife "embellished minor accidental injuries" into abuse. Wife did not consult with any professionals before filing the RFA petition. Thus, this is not a case where the absence of abuse was ever legitimately in doubt. Further, wife's action in embellishing the evidence that did exist suggests she knew that the facts alone without the embellishment were insufficient to show abuse.

¶ 35. On this point, the most important. finding was that the RFA petition was part of a "course of conduct" to alienate the child from husband and it was related to wife's mental health issues. As we said in *Renaud*, we do not want to stifle a parent from filing an RFA petition. But where the filing of the RFA petition was one of a number of acts wife engaged in to alienate the child from husband, and these were related to her mental health issues, the possible stifling effect of the custody decision is limited.

¶ 36. For the above reasons, we affirm the superior court decision as to factor (5). Again, we stress the limited standard of review under which we operate. In concluding that the court properly weighed the factors that wife contests, we conclude that the overall custody decision was supported by the findings and the findings are sufficiently supported by the evidence.

## III.

¶ 37. There were a number of irregularities in the proceedings below. None, however, merits reversal.

### A.

¶ 38. At the hearing on January 3, 2012, the trial judge went through a long personal questioning of the parties, a portion of which he conducted before swearing them in. The information he solicited was mostly background information related to the parties' hometowns, education, employment, and relationship, as well as the history of the proceedings. Both parties affirmed, after being sworn in, that everything they had said had been truthful. Husband's lawyer requested a number of times that the two parties be sworn in. Wife now contends that we should reverse because this questioning cast doubt on the judge's impartiality.

■ ¶ 39. Although husband's lawyer objected, wife's lawyer did not object at the time to either the questioning itself or to the failure to administer an oath to the parties. A party must object to raise the admission of evidence on appeal. V.R.E. 103(a)(1); *Damone v. Damone*, 172 Vt. 504, 515, 782 A.2d 1208, 1217 (2001). Vermont Rule of Evidence 614(c) has a special rule governing when objections can be made to a judge's questioning: "[o]bjections . . . to interrogation by [the court] may be made at the time or at the next available opportunity when the jury is not present." As there was no jury in this case, wife could have objected at any time, but failed to do so. Likewise, wife waived any claim of error relating to the parties initially not having been sworn in by failing to raise any objection to that. See *State v. Bailey*, 2012-Ohio-1694, ¶ 23, 2012 WL 1307095 (Ct. App.) (" '[T]he failure to administer an oath can easily be corrected at the time; an attorney may not fail to object and then cite the lack of an oath as error.' " (quoting *State v. Norman*, 738 N.E.2d 403, 412 (Ohio Ct. App. 1999))); *Beck v. State*, 719 S.W.2d 205, 212 (Tex. Crim. App. 1986) (describing rule in civil cases that "[w]here a party sits and allows an unsworn witness to testify without objection, he thereby waives such irregularity").

■ ¶ 40. Absent a timely objection to the judge's questioning and to the failure to administer oaths, we review only for plain error — and in civil cases, will find such error " 'only in limited circumstances, i.e., when an appellant raises a claim of deprivation of fundamental rights, or when a liberty interest is at stake in a quasi-criminal or hybrid civil-criminal probation hearing.' " *Pcolar v. Casella Waste Sys., Inc.*, 2012 VT 58, ¶ 21, 192 Vt. 343, 59 A.3d 702 (quoting *Follo v. Florindo*, 2009 VT 11, ¶ 16, 185 Vt. 390, 970 A.2d 1230).

■ ¶ 41. We find no plain error here. Indeed, there is no indication of any prejudice whatsoever to wife. This case can easily be distinguished from *Auger v. Auger*, in which we reversed even when no objection was made based on — among other things — a trial judge's excessive personal questioning of the witnesses. 149 Vt. 559, 546 A.2d 1373 (1988). In that case, we found that the trial judge took control of the proceedings to an extent that the defendant was "deprived . . . of a fair trial." *Id.* at 560, 546 A.2d at 1374. The activities of the judge included choosing the order of witnesses, announcing an "inclination" as to the outcome of the

case before testimony had concluded, cutting off defense counsel's direct examination of a witness, engaging in extensive questioning of witnesses throughout the trial, and asking in a written opinion denying the defendant's motion for a new trial: "[W]hat is the importance of [the] consideration [of the appearance of neutrality] outside the scope of jury trials?" *Id.* at 560-61, 546 A.2d at 1374. Here, the judge solicited background information, but made no attempt to control the lawyers' conduct at later points in the trial,[9] and emphasized the importance of impartiality. We therefore decline to reverse any part of the trial court's decision based on his irregular questioning of the parties.

¶ 42. Our holding should not be taken as an endorsement of the procedure the court followed. Questioning parties on evidentiary matters, without an oath, raises a risk of inconsistency between unsworn testimony and sworn testimony. Although generally on context and background facts, the questioning was quite extensive and used up substantial time. The majority opinion in *Auger* describes some of the potential consequences from extensive judicial interrogation. *Id.* at 561-63, 546 A.2d at 1374-76. While the interrogation here did not reach the point where these consequences resulted, the court took an unnecessary risk in assuming an extensive, active role in questioning.

## B.

¶ 43. The court issued oral findings of fact and conclusions of law, and an order on parental rights and responsibilities, on January 2, 2012. Thereafter, it conducted a further evidentiary hearing on property disposition and attorney's fees and issued a written decision on those subjects on June 4, 2012, five months after the parental rights and responsibilities hearing. Without any advance notice, the court included written findings of fact, conclusions of law, and an order on parental rights and responsibilities. By that time, the oral decision had been implemented, and wife had sought a stay, unsuccessfully, in this Court.

¶ 44. There were a number of differences between the oral and written decisions. Although the basic findings were the same, the

---

[9] The judge did, at the end of the trial, inform husband's lawyer that he need not conduct cross-examination of mother's witness, as he had already come to a decision — however, whether or not that prejudiced father, it certainly did not prejudice mother.

court changed the analysis and conclusions on some of the factors required by § 665(b). In each case, the new analysis and conclusions were favorable to husband. Wife argues that we should reverse the custody decision because of the differences on this basis because we cannot determine "what was decided, and why." *Turner v. Turner*, 2004 VT 5, ¶ 7, 176 Vt. 588, 844 A.2d 764 (mem).

■ ¶ 45. Oral findings, when transcribed, are the equivalent of written findings. V.R.C.P. 52(a)(2); *State v. Allen*, 145 Vt. 593, 597, 496 A.2d 168, 170 (1985). Many courts have held that where there are inconsistencies between oral and written findings, written findings control. See, e.g., *Thyssenkrupp Safway, Inc. v. Hyland Hills Parks & Recreation Dist.*, 271 P.3d 587, 589 (Colo. App. 2011) ("[W]hen a court makes oral findings and conclusions that differ from its final written rulings, the final written order controls."); *Grundy v. Brack Family Trust*, 213 P.3d 619, 626 (Wash. Ct. App. 2009) ("[W]ritten findings control where they conflict with an oral decision."); *In re A.B.K.*, No. 10-06-00272-CV, 2007 WL 3293724, at *5 (Tex. App. Nov. 7, 2007) (mem.) ("The court's written findings necessarily supersede any oral findings stated on the record."); *Ogden v. Ogden*, 39 P.3d 513, 518 (Alaska 2001) ("Normally, when inconsistencies arise between a court's oral and written findings, the written decision prevails.").

■ ¶ 46. We agree — where inconsistencies exist between oral and written findings, the written findings must prevail. Our preference for written findings over oral findings is due to their more precise nature, allowing litigants to clearly understand the decision and facilitating appellate review. See *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 17, 176 P.3d 476 ("[F]or purposes of appellate review, written findings are the better practice because they reduce the likelihood of ambiguity created by an incomplete or unclear record"); *State v. Tuttle*, 2002 S.D. 94, ¶ 29 n.11, 650 N.W.2d 20 (expressing preference for written findings of fact and conclusions of law over oral findings "in order to aid appellate review and to promote accuracy"); *State v. Wilson*, 513 A.2d 620, 633 (Conn. 1986) (declining to decide between conflicting oral and written findings, but noting that "[t]he reduction of one's thoughts to writing generally indicates a greater opportunity for considered analysis and careful reflection"). We therefore take the trial court's written findings of fact as authoritative, and conduct our appellate review using those findings.

¶ 47. As for whether issuing initial oral findings that in some particulars and analyses were in conflict with the later written findings and analyses merits reversal, wife has failed to show prejudice, and any error is therefore presumed to be harmless. See *State Highway Bd. v. Pratt*, 127 Vt. 385, 394, 250 A.2d 726, 732 (1969) ("[T]he party who alleges error has the burden of showing that he has been prejudiced thereby. Otherwise it is presumed to be harmless, if it is error at all." (citation omitted)).

¶ 48. A review of the changes between the oral and written findings reinforces our conclusion that there was no prejudice. We will not address each of the inconsistencies in the factual findings, but the changes in the analyses of the statutory factors can be described as follows. Regarding criteria (1), (4), and (9), the court changed its analysis from an even weight between the parties to weighing or strongly weighing in favor of husband. Regarding criterion (6), the court orally found that there was a slight advantage to wife, but that both parents have the ability to be the primary caregiver and have demonstrated such; whereas the court's written findings found criterion (6) to be weighted evenly between both parties. Overall, the change from the oral findings to the written findings was in husband's favor — but the conclusion as to custody was the same each time.

¶ 49. In addition, wife points out a general change in tone between the oral findings, which she found to be more balanced, and the written findings. Many of the distinctions she points out are noticeable.[10] However, given that custody was awarded to husband even in the more sympathetic (to wife) oral findings,

---

[10] For example, in its oral findings, concerning criterion (1) the court discussed that wife and husband each have "issues" but that both "[c]learly care about this child. . . . and that [they] would both make good parents in the sense that [they] would nurture and guide this child in an appropriate manner." In its written findings, however, the court discussed that it is "greatly concerned about [wife]'s conduct involving self-harm and displays of physical aggression when suffering from mental illness." The court further found that, "These factors place the child at significant risk, both emotionally and physically and undermine [wife]'s efforts to nurture and protect the child." Again, the court appears to have changed its tone regarding criterion (4). The court found from the bench that the child was doing well in Washington and has done well in Vermont, whereas in its written findings, the court found that it was unclear how the child had adjusted to Washington. The court made clear that "[wife] strives to convince the [c]ourt that she was well adjusted and benefitted from the experience. [But,] [t]here is no corroborating evidence from the educational system on this point."

there was no prejudice. Accordingly, we decline to reverse on this basis.

¶ 50. Again, we do not endorse the procedure the court employed. The oral decision was implemented almost immediately, and wife appealed to this Court, withdrawing the appeal at that time only when we denied a stay. If the appeal had gone forward, we may not have had the benefit of the written decision. The written decision suggests that the oral decision was insufficiently considered, a poor impression for a decision that determined the custody of a child. On the other hand, the fact-finding mistakes in the written decision suggest the court was losing its recollection of the facts. We are not criticizing the practice of rendering oral decisions on the record, particularly where a timely result is important, but we are stressing that any oral decisions should be of sufficient quality and completeness to stand on their own without a subsequent written decision.

## IV.

¶ 51. Wife objects to two of the trial court's decisions on the marital property: (1) the award of the marital home to the husband without any of the equity going to wife; and (2) the award of $2000 to husband to reimburse him for half of the value of the personal property that wife removed from the marital home.

¶ 52. The disposition of property pursuant to a divorce decree is a matter of wide discretion for the trial court. *Roberts v. Roberts*, 146 Vt. 498, 499, 505 A.2d 676, 677 (1986); *Atwood v. Atwood*, 143 Vt. 298, 300, 465 A.2d 1354, 1355 (1983). The court's disposition will not be disturbed, "[u]nless the court's discretion was abused, withheld or exercised on untenable grounds or to a clearly unreasonable extent." *Roberts*, 146 Vt. at 499, 505 A.2d at 677. 15 V.S.A. § 751 contains a number of factors the court may consider in making the division. The court need not specify the weight given to each factor. *Molleur v. Molleur*, 2012 VT 16, ¶ 15, 191 Vt. 202, 44 A.3d 763 (" 'The court need not specify the weight given to each factor, but is required only to provide a clear statement as to what was decided and why.' " (quoting *Jakab v. Jakab*, 163 Vt. 575, 585, 664 A.2d 261, 267 (1995)). In fact, the court is not required to specifically address each factor, as long as findings are made that respond to the factors and the court makes

clear the basis of its decisions. See *Molleur*, 2012 VT 16, ¶ 15 (approving division because "the court, both directly and indirectly, explained the basis of its decision and why it was equitable"); *Lalumiere v. Lalumiere*, 149 Vt. 469, 471, 544 A.2d 1170, 1172 (1988) ("Findings were made as to many of the factors set out in § 751. We find no indication that the trial court's discretion was either withheld or abused.").

¶ 53. The trial court here made findings as to many of the 15 V.S.A. § 751 factors, and, overall, made clear that it was trying to make the division approximately equitable.[11] In its written findings, it stated: "From a financial point of view, there is little at stake except for the division of debts." Overall, it seemed to adhere to this plan — the only awards that were not essentially equal were that of the equity in the home (awarded to husband), $2000 for personal property removed from the home (awarded to husband), and the payout from the lawsuit against her former employer, Priority One (awarded to wife — although she testified at the time of the March hearing that there was no money left from that settlement).

¶ 54. The court awarded the marital residence to husband, "free and clear of any interest of [wife]." The only explanation of the decision came in the findings, where the court stated: "[Wife] has expressed her consent that [the marital home] be awarded to [husband], together with any and all financial obligations associated therewith." This is not reflected in the record. An examination of the trial record reveals that wife's lawyer did state in the January 2, 2012 hearing relating to custody: "Judge, if it helps on property, we're prepared to stipulate that he has the '98 Subaru, we have the '97 Subaru; they each have their own debt; they each have their property in their respective possession; he has the condominium and refinanced it to remove her name." This proposed stipulation was never agreed to. When wife was questioned about the property at the March hearing she responded that she agreed to ceding the marital home to husband only if she did not have to pay anything else to husband. She stated: "[I]f for some reason I have to pay him for something, then I would like the

---

[11] For example, in the March hearing, the trial court specifically questioned wife about the equitable division of property as well as both parties assuming responsibility for their own debts and going their own way financially.

$5000 in equity."[12] This was only a contingent agreement that husband would receive the full equity in the house, and the contingency was not realized because the court ordered that wife pay husband for part of the personal property she took from the home and for attorney's fees.

¶ 55. Husband defends on this point by arguing that it was within the court's discretion to award him the full value of the equity in the home, particularly because they would incur a penalty if the home were sold and the real estate broker's commission would eliminate the equity in any sale. We do not dispute husband's points, but the court's decision is based on a mistaken understanding that wife had agreed to husband keeping the equity and not on an equitable division of the property. Accordingly, we must reverse and remand the property distribution with respect to the real property.

¶ 56. Normally, we would remand the entire property division to give the court flexibility in fashioning its property award, and we do so here. Wife has, however, also challenged the distribution of the personal property, and we address that as it will arise in the remand. The trial court ordered that "[e]ach party shall be awarded personal property in his or her possession at this time." This would have fit in with the general plan, identified above, to make a generally equal distribution between the parties. However, it also ordered — without explanation — that wife "shall reimburse Husband $2,000.00 as his equitable share in the items removed from the home." This left husband with all of the personal property in his possession and half of the value of the personal property in wife's possession.

¶ 57. Wife testified at trial that she believed that the property had been already divided equitably by her removal of some items from the house. Husband, on the other hand, testified that wife had removed "all of the furniture." The court made no finding as to which of these accounts was correct, nor any finding of the value of the personal property overall. It included no explanation as to why it went beyond leaving each party with the property in the party's possession and awarded $2000 to husband — a sum representing husband's estimation of half of the value of the

---

[12] This statement is followed by a sentence that is partially inaudible. While this incomplete sentence may relate to the same subject, the earlier sentence is sufficiently definitive, and husband has not contested its accuracy.

furniture that wife removed from the home — without accounting for the value of the furniture and other personal property that remained in the home after wife's departure. The court's decision may be equitable, but without an explanation we cannot determine that. At a minimum, on remand, the court must provide an explanation for how it distributes the personal property.

## V.

¶ 58. The only attorney's fees that were awarded by the trial court were for the first Supreme Court appeal and motion for stay.[13] Wife argues (1) that these fees were improper because husband did not file a written motion for them within the time provided for in the statute, and (2) that the trial court did not properly consider the financial situations of the two parties in making its award.

## A.

¶ 59. Vermont Rule of Appellate Procedure 39(f) provides that: "Claims for attorneys' fees . . . arising on an appeal shall be made by motion in the trial court pursuant to Rule 54(d)(2) of the Vermont Rules of Civil Procedure within 14 days after issuance of the mandate . . . ."[14] This rule is properly applied to divorce cases. See *Harris v. Harris*, 168 Vt. 13, 26, 714 A.2d 626, 634-35 (1998); see also V.R.F.P. 4(a)(1) (Vermont Rules of Civil Procedure apply to divorce proceedings, except for certain specified rules not applicable here).

¶ 60. The attorney's fees awarded here included the fees associated with both the motion for stay pending appeal in the Supreme Court and the appeal itself, which was later withdrawn and was dismissed on February 28, 2012. Because the fees for preparing the motion to stay pending appeal are fees "arising on appeal," the date by which the motion for the award of such fees

---

[13] The trial court's order says that the $1100 award is for "fees incurred in connection with the Supreme Court appeal," and the calculation that was submitted by husband of that figure included work both on the eventually withdrawn appeal and the motion for stay pending appeal filed in the Supreme Court.

[14] For a normal opinion of the Supreme Court, the mandate is issued "21 days after the entry of judgment." V.R.A.P. 41(a). The appeal in question was dismissed because wife moved to withdraw it. Therefore, no "mandate" issued after the judgment itself, and the date of the dismissal should serve as the date that began the fourteen-day period for filing the motion for attorney's fees.

should be made is the same as the date by which a motion for the fees for the preparation of the appeal itself must be made. Accordingly, husband was required to move for an award of attorney's fees associated with both the motion to stay and the appeal within fourteen days of February 28, 2012.

¶ 61. As wife acknowledges, husband moved orally for the award of attorney's fees during the hearing on financial issues that took place on March 2, 2012 — easily within the fourteen-day time frame. Husband submitted records of his attorney's fees into evidence, and wife made no objection.

¶ 62. Now, however, wife argues that husband's motion did not comply with the procedural requirements of Rule 54(d)(2) because the motion was made only orally. The point of having the requirement of a written motion, however, is to provide notice to the other party. See Reporter's Notes — 1996 Amendment, V.R.C.P. 54 ("The period is designed to assure that the opposing party is aware of the claim before the time for appeal has run and to allow the court in a nonjury case to act on the claim immediately after rendering its judgment on the merits, when the matters in issue are still fresh."). Here, where the motion was made in court, during the evidentiary hearing, in the presence of wife and wife's counsel, and no objection was made, there can be no serious argument that wife did not have notice of the motion, and we shall not enforce the requirement of a written motion so strictly.

B.

¶ 63. Wife further argues that in granting attorney's fees for the motion to stay and the withdrawn appeal to husband, the court did not properly consider the financial situation of the two parties.

¶ 64. The award of attorney's fees in a divorce action is a matter within the discretion of the trial court. *Milligan v. Milligan*, 158 Vt. 436, 444, 613 A.2d 1281, 1286 (1992); see 15 V.S.A. §§ 606, 607; *Lalumiere*, 149 Vt. at 473, 544 A.2d at 1173 ("In a divorce action, the court may determine whether to make an award of "suit money" based on the financial circumstances of the parties."); *Ely v. Ely*, 139 Vt. 238, 241, 427 A.2d 361, 363 (1981). The primary consideration in awarding attorney's fees is the ability of the supporting party to pay and the financial needs of the party receiving the award. *Nevitt v. Nevitt*, 155 Vt. 391, 399,

584 A.2d 1134, 1139 (1990). It is not necessary to hold a separate hearing on this issue, as the nature of divorce proceedings is such that the evidence relevant to this determination will already have come out. *Ely*, 139 Vt. at 242, 427 A.2d at 364.

¶ 65. Although we hesitate to do so because of the discretionary nature of an award of attorney's fees, we must reverse on this issue also, because a key finding that the court made related to the current financial situation of the two parties was not supported by the evidence, and because the court failed entirely to explain the equities it considered in making its decision.

¶ 66. In the June 4, 2012 written order, the court referred to the $37,000 settlement that wife received from her former employer, Priority One, and stated: "She has used a significant portion . . . . She continues to possess approximately $17,000 in a joint account with her mother." In the March 2, 2012 hearing, however, wife testified: "The money from my lawsuit was used up in the seven months that I did not get any child support for." Husband did not offer any testimony to contradict that statement, merely requesting half of the "proceeds" from that settlement. Thus, the finding that $17,000 remained in the account and was available to pay attorney's fees was not supported by the evidence. The evidence does not show the availability of other funds, other than the proceeds of wife's loans.

¶ 67. In relation to the two parties' financial situations apart from that settlement, the court found that "[wife] is not currently employed during the course of her law studies," and that "[husband] has been gainfully and steadily employed for in excess of a year and a half." These findings do not, on their face, support a conclusion that awarding attorney's fees to husband was equitable, and the court provided no explanation of its decision. We therefore reverse and remand for a reconsideration of the award of the attorney's fees.

*Affirmed as to the custody decision; reversed and remanded as to the division of the marital estate and the attorney's fees.*