2013 VT 79

## In re D.D., Juvenile

[82 A.3d 1143]

No. 12-417

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed September 13, 2013

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Appellant-Father.

*Michael Rose*, St. Albans, for Appellant-Mother.

*William H. Sorrell*, Attorney General, and *Robert F. McDougall*, Assistant Attorney General, Montpelier, for Appellee Department for Children and Families.

¶ 1. **Reiber, C.J.** Father appeals the trial court's conclusion that his son D.D. is a child in need of care or supervision (CHINS) because he was without proper medical care necessary for his well being under 33 V.S.A. § 5102(3)(B). Father argues that the record did not support the trial court's factual findings, which in turn did not support the trial court's legal conclusion. The State challenges the timeliness of father's appeal and, on the merits, argues that the trial court's findings and conclusions were adequately supported. We conclude father's appeal is untimely but reach the merits in this instance and affirm the trial court's substantive determination.

¶ 2. Child, D.D., was born in 2007 with obstructive uropathy, a condition which blocked and scarred his kidneys. As a result of this disorder, child's kidney function will deteriorate over time, and he will inevitably need dialysis or a transplant. Child requires ongoing medical care and supervision to help delay these invasive treatments. This medical care consists primarily of: monitoring of weight, kidney function, and red-blood-cell count; regular catheterization to relieve pressure on his kidneys; and weekly shots of the drug Epogen to prevent kidney-disease-related anemia.

¶ 3. Faced with perceived concerns about parents' ability to ensure child receives the routine care his condition demands, the Department for Children and Families (DCF) petitioned in February 2012 to have the then-four-year-old child declared CHINS. Based on an affidavit from a DCF caseworker, the court granted an emergency request to temporarily transfer custody to DCF and scheduled a temporary-care hearing for the following day, February 10, 2012. Parents, their appointed attorneys, the DCF attorney and a guardian ad litem participated in the temporary-care hearing. Following the hearing, the trial court issued a temporary-care order continuing DCF custody. In its order, the court concluded, on the basis of DCF's accompanying affidavit, that returning child to parents could result in substantial danger to child's health,

welfare, or safety. The court also found that DCF exercised due diligence to prevent child's unnecessary removal.

¶ 4. Some four months after the temporary care hearing, the court held a merits hearing. The hearing began on May 11, 2012 and was continued to June 20, 2012.

¶ 5. Child's primary-care physician testified at the May hearing. The physician, who had treated child since birth, indicated that child's condition was generally "great" apart from his chronic kidney disorder, which required close, routine monitoring. The physician also testified that parents routinely contact her when they have concerns about child's health, and although child has occasionally missed appointments because of transportation problems, parents follow up and reschedule when this occurs. In discussing child's degenerative kidney disorder, the doctor stressed the importance of regular laboratory monitoring. Any deterioration in child's organ function would not necessarily be readily apparent based simply on physical observation, and for that reason healthcare providers rely on laboratory testing to monitor child's progression. The physician indicated that the lab work was conducted at Fletcher Allen Health Care (FAHC).

¶ 6. A nephrologist from FAHC also testified at the merits hearing. As of the time of the hearing, the nephrologist reported that child's kidneys were functioning at two-thirds capacity. The nephrologist testified that physicians could only slow the progression of child's disease to give him more time to grow and develop before transplanting a kidney. When child eventually needs a transplant, it would likely be preceded by a period of dialysis requiring even more frequent visits to the health center. Afterward, child would need more frequent and regular medication to avoid rejection.

¶ 7. The nephrologist indicated that as part of the treatment to slow the progression of child's kidney disease and delay the inevitable transplant, it is imperative that child visit the hospital at least every three months for testing. According to the nephrologist and a member of the hospital administrative staff, child missed at least some scheduled appointments. Many of the missed appointments were attributed to transportation difficulties, while others were weather-related. On at least one occasion, mother simply forgot an appointment despite the pediatrician's assertion that she had called to remind the family of the appointment.

¶ 8. At a minimum, parents canceled or rescheduled appointments initially slated for September 13, 2011; January 10, 2012; January 12, 2012; January 24, 2012; and January 31, 2012. Between February 2011 and January 2012, parents brought child to only two scheduled appointments: one in June 2011 and another in November 2011.[1] Before the June appointment, the last time the nephrologist had seen child was September 2010. To establish this calendar of hospital visits, the court permitted a social worker to testify from a list of appointment dates compiled by an unknown staffer over parents' hearsay objection. Based on that list, the social worker described the reasons for which the appointments were missed or rescheduled. The social worker testified that parents missed the February 2011 appointment without rescheduling. The May 26, 2011 appointment was canceled because of transportation problems, but rescheduled for June 9. In September 2011, the family offered no excuse for not showing up. Despite several rescheduling calls, child attended appointments in June 2011, November 2011, and February 2012. The family called to cancel and reschedule the January 2012 appointment four times because of transportation and bad roads.

¶ 9. A home-care nurse who has treated child for about four years also testified at the hearing. The nurse indicated that she visits child weekly, at which time she monitors child's growth; checks on his vesicostomy — a surgical hole in the bladder used for catheterization; tracks his urine output; and administers his weekly Epogen shot, which parents obtain from a pharmacy. The nurse offered a mixed perspective on parents' ability to care for child. The nurse testified that parents properly performed the catheterization and, in fact, mother showed the nurse how to perform the drainage. Despite parents' apparent attentiveness in this respect, however, the nurse recalled several occasions on which child did not receive his Epogen shot, the importance of which the nurse and other healthcare providers had stressed. Specifically, the child did not receive his shot as scheduled: once in October 2011, when parents did not hear the nurse knocking on the door of the house; once in September 2011, when parents forgot to pick up the medication at the pharmacy; and once in

---

[1] The State argues that appointments were scheduled for February 24, 2011, and May 26, 2011, as well. Father maintains that apart from inadmissible hearsay evidence, there is no record support for these dates and others.

February 2012, after child had been placed in temporary DCF custody. The number of shots missed may have been more extensive, according to the nurse's testimony.

¶ 10. As a general matter, the nurse recalled that the family's frequent relocations at times made keeping scheduled appointments difficult. The nurse said that on occasion several weeks had passed when she could not locate the family because they had moved. According to the nurse, the family moved about seven times during the time she treated child. The locations to which the family moved offered varying levels of accommodations for parents, child and his siblings. The residences did not always have water.

¶ 11. Mother testified that there was a two-week gap in visiting-nurse coverage when the family moved from Berkshire to Enosburg in May 2011. According to mother, the nurse's GPS had misdirected her.

¶ 12. With respect to hospital and doctor care, mother reported that the family met with healthcare providers in August 2011 to discuss ongoing treatment plans. During the meeting, the family agreed to make sure child went to FAHC once every three months. According to mother, the family did not make it to a September 2011 appointment at FAHC because they were in the process of moving. Mother stated that it was a hectic time and she forgot about the appointment. At the same time, father got a MRSA infection following surgery. Mother recalled that lack of transportation made it difficult to attend appointments. Mother described Medicaid transportation as an unreliable substitute, either failing to pick up the family to travel to scheduled appointments or leaving them stranded in Burlington afterward. Mother indicated that these transportation difficulties did not have a material impact on child's care. She noted, for example, that when she contacted FAHC about the four rescheduled January appointments, she was told that it was not necessary to travel to FAHC and to make alternate arrangements to bring child to a pediatrician in Enosburg to have the blood work done at that time.

¶ 13. Mother also described her history with substance abuse. She explained that she did not attend Brattleboro Retreat for treatment as she initially planned, but did complete Act One substance-abuse programming and had been clean for sixty days at the time of the hearing.

¶ 14. Father testified during the hearing, describing the family's transportation and living situations. He stated that in 2011 the family did not have transportation. With regard to housing, father reported that the family had moved out of a camper they had occupied on a relative's property and had housing with room for child.

¶ 15. The hearing was continued to June 20, 2012, at which time the trial court orally summarized its findings and ordered DCF to submit proposed written findings. Among the court's oral findings were that:

- Child suffers from a serious obstructive kidney disorder requiring medical treatment, including draining child's bladder to relieve pressure.

- Regular treatment and doctor contact is necessary to delay kidney-function loss leading to eventual dialysis and transplant; "otherwise, the kidneys will fail prematurely."

- Appropriate doctor contact includes monthly visits to the pediatrician and visits every three months to the nephrologist in Burlington.

- Before June 2011, the specialized kidney doctors had last seen child in September 2010.

- Parents "regularly failed to follow a schedule, which makes it difficult for the doctor to track the kidney function and whether or not the child is suffering from anemia."

- Parents missed two nephrology appointments without calling, one in February 2011, and another that mother forgot in September 2011, less than two weeks after a meeting between medical workers and parents to discuss the importance of regular doctor appointments.

- Parents canceled a May 26, 2011 nephrology appointment because of transportation issues, but went on June 9, 2011.

- Parents brought child to a nephrology appointment as scheduled in November 2011.

- Parents canceled but rescheduled nephrology appointments four times in January 2012, the first for lack of transportation, the second because of bad roads, and the last two for no reason.

- Child attended a scheduled nephrology appointment in February 2012 after he was in DCF custody.

- Lab work showed child was iron deficient in June 2011 at the lowest level recorded to date.

- Child must be administered Epogen or his red blood cells, important for growth, brain development, and learning, will decline.

- Family lacks "vehicle, transportation, access to a vehicle, license, has difficulty making appointments."

- Family has moved multiple times, meaning "that the nurse, who brings the weekly Epogen shots to the family, sometimes has no idea where the family has been."

- "[T]here were a number of missed [Epogen] shots, according to the visiting nurse."

- Family "suffers from instability" and "there is substance abuse."

Based on these findings, the court concluded child was without proper parental care with respect to medical treatment and continued DCF custody with family visits.

¶ 16. The court noted in a scheduling order that its findings were on the record, that child was CHINS, that "parents go to appts," that child "misses parents," and that "[mother] is in substance abuse treatment." A short time later, the trial court ordered a case plan from DCF.

¶ 17. About a month later, DCF submitted its proposed findings. The trial court adopted DCF's proposal verbatim, handwriting "so found" and signing, despite the fact that the proposed written findings differed in many significant respects from the court's earlier oral findings and, in at least one case, directly contradicted the court's own entry orders. Among the proposed written findings not contained in the oral findings were:

- DCF received a report from FAHC June 17, 2011, regarding inadequate care.

- An employee of FAHC reported that parents had not picked up an antibiotic for child.

- FAHC records reflected two canceled appointments in January 2010, one because of a car not starting and another to coordinate with a surgical doctor. The same records reflect that mother canceled an early February appointment but did arrive for the rescheduled February 25 appointment; that family missed without calling a May 2010 appointment; that family attended a September 2010 appointment; that family canceled a September 16 appointment and a December appointment.

- Parents are not employed so there is little income for the household.

- Mother has "admitted substance abuse history but has yet to follow through with treatment."

¶ 18. At a disposition hearing in September 2012, parents agreed to DCF's continued custody subject to a transitional plan to reunite child with his parents in sixty days. The court held a disposition hearing on October 9, 2012. The court entered a disposition order two days later. Father appealed the trial court's merits determination on November 8, 2012.

¶ 19. On appeal, father argues (1) that the written findings, which the court adopted verbatim without scrutiny, are not supported by the record; (2) that the trial court improperly admitted hearsay evidence consisting of a tally of missed medical appointments drafted by an unnamed clinic staffer; and (3) that neither the court's oral nor written findings support its conclusion the child was without proper medical care. While DCF acknowledges the inadequacy of some written findings, it nonetheless maintains that the relevant ones — written and oral — do find support in the record and are sufficient to support the trial court's legal conclusion that child was a CHINS. DCF also challenges the timeliness of father's appeal.

I.

¶ 20. ■ We begin with DCF's argument that father's appeal was untimely filed. Vermont Rule of Appellate Procedure 4 requires a party to file a notice of appeal within thirty days of the entry of judgment or order appealed. The timely filing of a notice

of appeal is "a jurisdictional requirement." *In re Guardianship of L.B.*, 147 Vt. 82, 84, 510 A.2d 1319, 1321 (1986). The parties agree that father did not file a notice of appeal within thirty days of the date of the CHINS determination, but disagree as to whether his notice of appeal was nonetheless effective to challenge the merits adjudication. Their disagreement stems from the bifurcated nature of Vermont's child abuse and neglect proceedings. See *In re L.S.*, 147 Vt. 36, 38, 509 A.2d 1017, 1019 (1986) (explaining "bifurcated nature of juvenile proceedings"). First, there is a merits adjudication during which the State must prove the allegations in the CHINS petition, and the court must find by a preponderance of the evidence whether the child is abused or neglected. See 33 V.S.A. § 5315(a) (requiring State to prove by preponderance of evidence that child is in need of care and supervision at merits). Second, there is a disposition hearing, which decides the terms of the child's placement and protection. *Id.* § 5318(a) (directing court to make orders related to child's custody at disposition). In this case, a merits decision was entered on July 25, 2012, and a disposition order was entered on October 11, 2012. Father filed a notice of appeal on November 8, 2012, seeking to appeal both the merits and the disposition orders. The State argues that the merits decision was a final order and that father's appeal — filed beyond the thirty-day appeal period — was untimely. Father argues that this Court should permit appeals of CHINS decisions after disposition, which father deems the final order.

¶ 21. ■ Therefore, the timeliness of father's appeal depends on two questions: whether a CHINS merits decision is a final appealable order and whether failure to appeal that decision within thirty days forecloses the right to later challenge it. In answer, we conclude that the merits decision is a final order and that failure to bring an appeal of that order within thirty days bars subsequent challenges to the order.

¶ 22. ■ We begin with the finality question. Generally, the test for finality is whether an order has disposed of all matters before the court by settling the rights of the parties. See *In re A.D.T.*, 174 Vt. 369, 373, 817 A.2d 20, 24 (2002); *In re Cent. Vt. Ry.*, 148 Vt. 177, 178, 530 A.2d 579, 580 (1987). In juvenile proceedings, finality is measured differently from other types of cases given the important rights at stake and the ongoing nature of the proceeding. The statute on child-neglect proceedings indicates that a

disposition is a final order, 33 V.S.A. § 5318(d), but, unlike some other states' statutes, does not otherwise define which orders are final and appealable.[2]

¶ 23. ■ Thus, we must examine the nature of the CHINS decision. The merits adjudication conclusively establishes for the first time the facts that justify state intervention into the family. No further factual development is necessary for review, and the subsequent proceedings, including disposition, relate to different matters. For these reasons, we concluded in our recent decision *In re C.P.*, 2012 VT 100, 193 Vt. 29, 71 A.3d 1142, that a CHINS merits adjudication was a final appealable order. In *In re C.P.*, the State sought termination at the initial disposition, and the parents attempted to challenge the court's jurisdiction to adjudicate the child-neglect proceeding. We held that parents could not collaterally attack the underlying CHINS merits adjudication on jurisdictional grounds when they failed to challenge that jurisdiction during the initial stages of the proceeding or to appeal the CHINS decision. *Id.* ¶ 20. We explained: "[A] CHINS proceeding determines issues critical to the child's welfare and custody status, and while not the last word on the subject, it is certainly a final judgment." *Id.* ¶ 28. This holding was consistent with prior published and unpublished decisions of this Court holding that a CHINS decision is a final judgment. See *In re P.J.*, 2009 VT 5, ¶ 11, 185 Vt. 606, 969 A.2d 133 (mem.) (noting that res judicata applies to CHINS decision because CHINS is "a final judgment"); *In re M.A.V.*, No. 2011-120, 2011 WL 4975620 (Vt. Aug. 15, 2011) (3-Justice mem.) (dismissing as untimely CHINS appeal filed beyond thirty-day appeal period).

¶ 24. ■ To hold otherwise would be detrimental to both parents and children. Parents' interests in the care and management of their children may be harmed by requiring them to wait until after disposition for appellate review. Although disposition should occur within thirty-five days after a CHINS adjudication, 33 V.S.A. § 5317(a), this timeline is not mandatory. See *In re J.R.*,

---

[2] Some state statutes delineate in their juvenile code or relevant procedural rules which orders are appealable. See, e.g., Kan. Stat. Ann. § 38-2273(a) (appealable orders include temporary custody, adjudication, disposition, finding of unfitness and termination of parental rights); Ohio Rev. Code Ann. § 419A.205 (listing final judgments for purposes of appeal as including jurisdictional decision, judgment disposing of petition, final disposition, final order).

153 Vt. 85, 92-93, 570 A.2d 154, 157-58 (1989) (holding that nothing in juvenile statutes suggests that delay in holding disposition hearing beyond statutory time limit voided disposition order or CHINS adjudication). In reality, there can be much longer delays. See, e.g., *In re H.F.*, No. 2012-064, 2012 WL 6827286 (Vt. Nov. 8, 2012) (3-Justice mem.) (nineteen months between contested CHINS and final disposition order); *In re S.M.*, No. 2010-445, 2011 WL 4974788 (Vt. Mar. 4, 2011) (3-Justice mem.) (CHINS in June 2009 and termination at initial disposition after hearing in August 2010). During the interim period between CHINS and disposition the court is authorized to issue orders for the child's temporary care. 33 V.S.A. § 5317(e). Therefore, pending a disposition hearing, the child may be placed outside of the parents' care.

¶ 25. ▮ Leaving parents without the right to review until after disposition — a potentially considerable length of time — could result in a long separation period, which in turn could permanently damage the parent-child bond, especially for a young child. Thus, although a CHINS determination does not permanently resolve the child-neglect proceeding, it is, nonetheless, a final, appealable order because it can result in a prolonged intrusion into parents' "fundamental liberty interest . . . in the care, custody, and management of their child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

¶ 26. ▮ In addition, the child's best interests favor immediate review of the merits decision. The Legislature has demonstrated a preference for providing children with permanency and stability. See 33 V.S.A. § 5101(a)(4) (directing that juvenile statutes should be construed "[t]o assure that safety and timely permanency for children are the paramount concerns"). This policy is best served by resolving the child's status as quickly as possible since children continue to develop and form relationships during the period between a merits adjudication and disposition. If a CHINS adjudication is made in error, it is far better for the child to have the error remedied immediately so that she may be returned to her parents' care before a long period of separation has harmed the relationship. Alternatively, allowing parents to wait until after disposition to challenge a CHINS order could increase periods of disruption and uncertainty for a child, who has formed important relationships pending disposition.

¶ 27. Other courts have similarly held that in the context of juvenile proceedings, traditional notions of finality are not appli-

cable and temporary interim orders may be final appealable orders. See *In re Doe*, 883 P.2d 30, 35 (Haw. 1994) (citing cases). As explained above, these courts make such allowances because a parent's fundamental right to custody and control of their children is at stake and because the nature of juvenile proceedings is different from other types of cases in that they involve an ongoing and evolving process. For these reasons, other courts have also required parties to immediately appeal a neglect or dependency adjudication.[3] See, e.g., *Lindsey M. v. Ariz. Dep't of Econ. Sec.*, 127 P.3d 59, 61-62 (Ariz. Ct. App. 2006) (both dependency adjudication and disposition are appealable orders); *In re Shamika F.*, 773 A.2d 347, 361 (Conn. 2001) (temporary order in child custody proceeding immediately appealable, and cannot be challenged at termination); *In re Stephen M.*, 953 A.2d 668 (Conn. App. Ct. 2008) (adjudication of neglect is final, and party must appeal or lose opportunity to challenge); *In re V.S.*, 495 S.E.2d 142, 145 (Ga. Ct. App. 1997) (unappealed order finding children were deprived cannot be challenged at termination); *Hooper v. Rockwell*, 513 S.E.2d 358, 364 (S.C. 1999) (order after merits hearing and later

---

[3] Several other states with bifurcated neglect proceedings require a party to wait until after disposition to appeal a merits decision. See, e.g., *In re E.A.*, 638 P.2d 278, 282 (Colo. 1981) (holding that dependency adjudication not final until after decree of disposition and both orders can be appealed together at that time); *In re Leona W.*, 888 N.E.2d 72, 81 (Ill. 2008) (proper method to appeal findings of abuse is after disposition); *In re Long*, 313 N.W.2d 473, 477 (Iowa 1981) (merits adjudication is not final without disposition); *In re D.I.G.*, 114 P.3d 173, 174-75 (Kan. Ct. App. 2005) (under statute, must challenge neglect finding after temporary custody order is issued); *In re K.S.*, 856 S.W.2d 915, 917 (Mo. Ct. App. 1993) (per curiam) (holding that there is no final appealable judgment until disposition is entered); *In re J.N.S.*, 704 S.E.2d 511, 516 (N.C. Ct. App. 2010) (adjudication and disposition linked and adjudication not final until after disposition); *In re S.H.*, 337 N.W.2d 179, 180 (S.D. 1983) (adjudicatory order not final until after disposition when time to appeal both begins); *In re Hannah S.*, 324 S.W.3d 520, 527 (Tenn. Ct. App. 2010) (appeal after disposition is timely to appeal merits based on statute allowing appeal "following the juvenile court's disposition" (quotation omitted)). The reasons given for waiting until after disposition include avoiding the duplication, waste and confusion of having two separate appeals pending from the merits and disposition, see *In re J.N.S.*, 704 S.E.2d at 516; *Hannah S.*, 324 S.W.3d at 527, and avoiding unnecessary appeals by requiring parents to appeal the merits, see *In re Long*, 313 N.W.2d at 476 (explaining that parent has less desire to appeal merits if child remains with parent at disposition). While certainly these are valid concerns, they are alleviated by allowing parties to move to hold the merits appeal in abeyance pending disposition and to consolidate the appeals for consideration. See *infra*, ¶ 30.

order regarding treatment, placement or permanent plan are both final orders that must be timely appealed).

¶ 28. These courts emphasize that children have a strong interest in avoiding belated challenges to juvenile orders. A long period of time in foster care has the potential to establish a stable long-term relationship for a child and "[a] grave injustice would be committed against children if a parent were permitted to appeal from a judgment of temporary custody long after they had established a stable relationship with foster parents." *In re Shamika F.*, 773 A.2d at 361-62. In addition, an immediate appeal protects the parents' interest in avoiding disruption to family integrity. *Id.* If parents have to wait to appeal a merits adjudication, then there may be a resulting unacceptable infringement on the parents' rights. *Hooper*, 513 S.E.2d at 364.

¶ 29. Father posits that parents should not have to choose whether to appeal a merits decision immediately, but should be able to do so then *or* after disposition. Father argues that this would be consistent with *In re C.P.*, 2012 VT 100, which he construes as not limiting appeals to only after CHINS, but leaving open the possibility that a CHINS order could *also* be appealed after disposition. Our research reveals only one decision adopting such a process. See *In re Calvin*, No. 2001-G-2379, 2002-Ohio-6468, ¶ 25 (Ct. App. Nov. 22, 2002). We decline to allow a dual appeal system. It would create uncertainty about the finality of the CHINS order and the decisions made therein. It is important for the parties to be able to rely on the merits adjudication so that they can move forward with services for the parents and planning for the child's best interests, whether that involves returning the child to the home or proceeding with adoption.

¶ 30. We recognize that the parents' decision about whether to contest the merits could depend on the outcome of the disposition hearing. Disposition hearings may result in a wide range of outcomes from family reunification to termination of parental rights. See 33 V.S.A. § 5318(a)(1) (order may continue or return legal custody to the custodial parent); *id.* § 5318(a)(5) (order may terminate all parental rights and responsibilities). A parent may decide not to challenge a CHINS adjudication provided that the outcome at disposition returns the child to the home or places the child with a relative. It would be wasteful to require a party to pursue a time-consuming and potentially unnecessary appeal in

that situation.[4] To prevent such inefficiencies, following a CHINS appeal, parties may move this Court to hold the merits appeal in abeyance pending a final disposition order. V.R.A.P. 33(b) (providing that Court may issue "all necessary scheduling orders"). Following disposition, the appealing party may move to dismiss the appeal or to consolidate the merits appeal with the disposition. Certainly, such a process would not be appropriate in all cases, but would be available to parties to prevent unnecessary briefing and argument in cases where, after disposition, a parent opts not to pursue the appeal.

¶ 31. ██ ██ Regardless of whether the CHINS appeal is stayed pending a final disposition order, it is important to emphasize that an appeal of the merits would not delay or stay proceedings in the family division, including the disposition hearing. Under V.R.F.P. 12(d)(2)(C), and V.R.A.P. 8(c), orders in juvenile matters are not stayed pending appeal, and the family division retains jurisdiction to modify, vacate and enforce its orders. Father argues that an appeal of a merits decision would divest the family division of jurisdiction to proceed with disposition because disposition is not a modification or enforcement of a prior order. Although the rules specify that the family division has jurisdiction to modify and enforce orders, the rules do not prevent the family division from exercising its jurisdiction to issue a disposition order. The purpose

---

[4] Father argues that requiring parents to immediately appeal a CHINS decision will greatly increase the number of appeals filed with this Court and will create acrimony between parents and DCF during the appeal period. To be sure, neither of these outcomes is desirable. It is unlikely, however, that there will be a flood of appeals given that the majority of CHINS determinations are made by stipulation of the parties. Our decision today does not alter the grounds upon which a party may challenge a stipulated order. See In re Cr. M., 163 Vt. 542, 546, 659 A.2d 1159, 1162 (1995) (holding that mother was bound by stipulated disposition, and could not challenge it at termination); In re A.O., 161 Vt. 302, 308, 640 A.2d 537, 540-41 (1994) (concluding that father's stipulations to disposition plan precluded his challenge to order based on lack of written findings). In addition, parents' relationship with DCF following a finding of CHINS should not be altered by an appeal of the merits adjudication. If the CHINS was contested in the family division, unfortunately, the parents and DCF may already be in an adversarial situation. Whatever the relationship, the appeal does not alter parents' incentives to cooperate with DCF pending a CHINS appeal because proceedings in the family division will not be stayed pending appeal. See infra, ¶ 31. As in all cases after a merits adjudication, DCF will have an obligation to assist in achieving goals in the permanency plan, and parents will have to work to achieve goals to obtain a positive outcome at disposition.

of allowing jurisdiction to continue in the family division is to further the Legislature's goal of resolving neglect and dependency cases in a timely way so that children can achieve permanency. This purpose is best served by allowing disposition to proceed while the CHINS merits decision is on appeal.

¶ 32. In this case, father appealed beyond the thirty-day time frame, and therefore his appeal of the CHINS decision was untimely. Father argues that this Court has routinely allowed appeals of the merits after disposition, and that he should not be punished for relying on those cases. We recognize that our jurisprudence regarding the appropriate time to appeal CHINS determinations has not been consistent. See *In re D.C.*, 160 Vt. 608, 610, 648 A.2d 816, 817 (1993) (mem.) (reversing merits decision where appeal notice filed after disposition); *In re B.B.*, 155 Vt. 365, 368, 584 A.2d 1126, 1127 (1990) (same). But see *In re M.A.V.*, 2011 WL 4975620, at *1 (unpublished mem.) (dismissing as untimely appeal filed more than thirty days after CHINS merits adjudication where party did not also appeal disposition). Particularly, where *In re C.P.*, 2012 VT 100, had not yet issued before father's notice of appeal was due in this case, his obligation to immediately appeal the decision was not evident. Given the uncertainty regarding whether a merits decision had to be appealed immediately or could instead be combined with an appeal of disposition, it would be fundamentally unfair to foreclose father from appealing the merits decision where important rights are at stake. See *In re A.D.T.*, 174 Vt. at 375, 817 A.2d at 25 (reaching merits of mother's untimely appeal of termination order given important rights at stake). We, therefore, apply our decision prospectively and reach the merits of father's appeal.

## II.

¶ 33. Father argues that many of the court's written findings were insufficiently supported, if at all.[5] We agree, but conclude that the remaining findings, which are supported by the record, are sufficient to support the court's ultimate conclusion.[6]

---

[5] DCF concedes that the court's written findings are "in some respects slightly overstated or characterized the evidence in a manner most supportive of the state's position."

[6] The court's findings must be on the record, but not necessarily written. See 33 V.S.A. § 5315(e) (findings must be on the record). We are mindful, however, that

¶ 34. ■■■ A child is "in need of care or supervision" when, among other possible situations, he is "without proper parental care or subsistence, education, medical, or other care necessary for his . . . well-being." 33 V.S.A. § 5102(3)(B). When reviewing a CHINS decision, we uphold the court's factual findings unless clearly erroneous and the court's legal conclusions when supported by those findings. *In re M.L.*, 2010 VT 5, ¶ 8, 187 Vt. 291, 993 A.2d 400. Findings lacking any evidentiary support are necessarily erroneous. See *In re D.B.*, 2003 VT 81, ¶ 4, 175 Vt. 618, 833 A.2d 1246 (mem.) (reversing where findings in termination-of-parental-rights case were devoid of evidentiary support). In juvenile proceedings, unsupported findings do not lead to reversal "[i]f the 'remainder of the court's findings, which are supported by the record, are sufficient to sustain the decision.' " *In re B.M.*, 165 Vt. at 205, 679 A.2d at 898 (quoting *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993)).

¶ 35. We agree with father that many of the written findings were wholly unsupported by the record. For example, we note that DCF concedes that seven of eight FAHC appointment dates in 2010 were wholly unsupported anywhere in the record and should not have been included in the proposed written findings reflexively adopted by the trial court. We note also that the court's written finding that mother had yet to follow up with substance-abuse treatment directly contradicts both the court's own notation on a scheduling order that mother was, in fact, getting treatment and mother's uncontroverted testimony that she had received treatment and had been clean for sixty days, as evidenced by lab results. Although there was testimony regarding parents' failure to pick up an Epogen shot, there was no testimony at all regarding an infection or failure by the parents to procure antibiotics. Other written findings contain minimal support in the record, although

the trial court voluntarily elected to adopt — apparently without any real scrutiny — DCF's exaggerated and, in some instances, unsupported proposed written findings. Given that other findings are supported and sufficient to support the court's conclusion that child's well being would suffer if he were returned home without DCF oversight, we affirm. See *In re B.M.*, 165 Vt. 194, 205, 679 A.2d 891, 898 (1996) (stating that in juvenile cases decision will be affirmed even if some findings are unsupported, where remainder of findings are sufficient to sustain decision).

The dissent states that public safety may require removal of the child from the home, *post*, ¶ 40. Although public safety may be a concern in a delinquency matter, see 33 V.S.A. § 311, it is not related to the child's removal in this case.

we conclude that they are immaterial to the ultimate decision and thus, if error at all, would constitute only harmless mistakes. It is not clear, for example, whether DCF received the alleged June 2011 report from FAHC indicating that child was not receiving adequate care. Although a hospital social worker testified to having concerns and to speaking with DCF about the family's situation, no one from DCF testified and no report was introduced into evidence. Similarly, the court found in both its oral and written findings that parents had difficulty with transportation. Father contends that there was no evidence to support the conclusion that family currently lacks access to transportation and that, in fact, people at their new residence could provide transportation. Whether that situation had ameliorated since parents moved in with family, however, was irrelevant to the observation that in the past parents had missed or been forced to reschedule medical appointments because of difficulty obtaining transportation.

¶ 36. ▮▮▮▮ Even accounting for these clearly erroneous findings, we conclude that the remainder of the court's written findings support the court's conclusion that child was a CHINS due to medical neglect.[7] Child has a serious kidney disorder that will cause a progressive decline in organ function. Child needs "constant and consistent monitoring and treatment to delay loss of kidney function and, more immediately, to delay the need for dialysis or transplant." Child requires Epogen shots on a regular basis and regular appointments to a kidney specialist. Despite parents' acknowledgement of the need for routine monitoring, they have missed several appointments.[8] Although the court's written findings regarding the missed appointments are not all supported, the record reflects that the parents missed some of these important visits. The nephrologist testified that she had not seen child between September 2010 and June 2011, meaning that child missed at least one scheduled appointment in February 2011. Mother also acknowledged missing a September appointment at the hospital because she forgot. By parents' own admission, there

---

[7] We do not rely on the court's oral findings because there are sufficient supported written findings to support the court's ultimate conclusion.

[8] We need not decide whether the trial court erred by permitting a hospital social worker to testify to appointment dates compiled by an undisclosed staff member in preparation for the hearing because there was separate, admissible testimony relating to the appointment dates relevant to our disposition of this case.

were several times when transportation posed an issue and they were forced to repeatedly reschedule hospital appointments, even if child was not late for a necessary check-up. It is also undisputed that child must receive regular Epogen shots to avoid kidney-disease-related anemia. The visiting nurse testified that on at least two occasions she was unable to administer the weekly shot.

¶ 37. Given child's undisputed health issues and parents' documented inability on multiple occasions to arrange for care, we conclude that the trial court findings that have support in the record are sufficient to justify the court's conclusion that child was a CHINS because of medical neglect. See *In re B.M.*, 165 Vt. at 205, 679 A.2d at 898. Because there are sufficient written findings to support the court's ultimate conclusion, there are no grounds for reversal.

*Affirmed.*

¶ 38. **Robinson, J.,** concurring in part, dissenting in part. I agree that the merits adjudication was a final, appealable order, and that father's notice of appeal, filed after disposition, was untimely. I also agree that given the gravity of rights at issue and the lack of clarity in our prior decisions, that we should reach the merits of father's appeal. I cannot agree, however, that notwithstanding the trial court's erroneous findings we should affirm the trial court's conclusion that D.D. was a child in need of care or supervision (CHINS). Therefore, I concur in Part I and dissent as to Part II.

¶ 39. We have long recognized that "the freedom of children and parents to relate to one another in the context of the family, free of governmental interference, is a basic liberty long established in our constitutional law." *In re N.H.*, 135 Vt. 230, 236, 373 A.2d 851, 856 (1977) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Stanley v. Illinois*, 405 U.S. 645 (1972)). The State's authority to interfere with that relationship in the name of protecting children is "awesome," and is accordingly subject to statutory and constitutional restraints. *Id.* at 235-37, 373 A.2d at 855-57. "Accordingly, any time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied." *Id.* at 235, 373 A.2d at 855.

¶ 40. Moreover, our laws contemplate separation of a child from his or her parents only when necessary for the child's welfare or in the interests of public safety, and require that a court, "[i]n determining that a child is endangered and that State intervention is necessary, . . . act with great care in deciding what type of intervention is appropriate." *Id.* at 236, 373 A.2d at 856. Such solicitude for protecting the parent-child relationship unless otherwise necessary to protect the child's welfare protects not only parents' constitutional rights, but the important interest many children have in maintaining the central relationship or set of relationships in their lives. See *Bell v. Squires*, 2003 VT 109, ¶ 18, 176 Vt. 557, 845 A.2d 1019 (mem.) (recognizing in divorce context that "a child's best interests are plainly furthered by nurturing the child's relationship with *both* parents" (quotation omitted)).

¶ 41. For the above reasons, the Legislature has long required that a CHINS order be supported by adequate findings on the record. See 33 V.S.A. § 5315(e); *id.* § 5526 (repealed); *In re M.C.P.*, 153 Vt. 275, 291, 571 A.2d 627, 636 (1989) ("We require that both merits and disposition orders be accompanied by findings of fact which are sufficient to support the court's conclusion that the child is in need of care or supervision or its disposition order."); see also *E.J.R. v. Young*, 162 Vt. 219, 225, 646 A.2d 1284, 1288 (1994) (requirement that disposition orders be supported by findings on record "goes to the solemn responsibility the justice system owes to Vermont citizens when a child is to be removed from the parental home.").

¶ 42. In this case, we have two sets of findings. The written findings, prepared by the State and endorsed by the trial court, are rife with assertions that are unsupported by the evidence:

- The written findings state that child's kidney function level was declining. Although the record evidence suggested that his kidney function was expected to decline over time, the only testimony about his trajectory during the year preceding the merits hearing suggested that his function had remained stable or even improved.

- The written findings asserted that mother had failed to follow-up on treatment for an admitted substance abuse problem. The only evidence in the record at the merits hearing was that mother had completed a substance abuse program and was sixty days clean.

- The written findings indicate that a Fletcher Allen Health Care (FAHC) social worker reported that parents failed to pick up an antibiotic needed to treat an infection. There was no such testimony.

- The written findings list a host of specialist appointments that child assertedly missed in 2010 — none of which were the subject of any testimony in the merits hearing.

- The written findings state that someone from FAHC reported to DCF in June 2011 that child was not receiving proper care. There was no evidence to support this finding.

These various clear errors hopelessly compromise the trial court's written findings in this case, undermining the level of confidence in the trial court's assessment of the situation that we require in order to uphold a State intervention of this gravity.[9]

¶ 43. The majority concludes that the trial court's ultimate conclusion is affirmable notwithstanding the carelessness of the trial court's written findings because the remaining findings *can* support the trial court's ultimate conclusion. *Ante,* ¶ 36. Removing a child from a loving, effective parent in the absence of a considered determination of harm and risk to the child on the basis of well-supported findings is not in a child's best interests. Given the multiple material misapprehensions of the record apparent in the trial court's findings, I cannot assume that, had the trial court properly understood the facts, it would have made a CHINS finding nor that a CHINS finding and removal of child from his parents are in child's best interests; under these

---

[9] In this case, where the trial court simply noted "so found" at the bottom of the proposed findings submitted by the State, the circumstances suggest that our recent generalization about the greater care reflected in written, as opposed to oral, findings is not necessarily true. *Hanson-Metayer v. Hanson-Metayer,* 2013 VT 29, ¶ 46, 193 Vt. 490, 70 A.3d 1036 (noting that preference for written over oral findings arises from "a greater opportunity for considered analysis and careful reflection" in written findings (quotation omitted)). This Court does not condemn the practice of relying on, or even adopting as a whole, proposed findings submitted by the parties, but does caution that the findings must reflect a careful review of all the evidence. V.R.C.P. 52(a) Reporter's Notes — 1987 Amendment. I note that counsel of record, as officers of the court, likewise have a duty to ensure that proposed findings submitted to the court reflect the evidence actually admitted at an evidentiary hearing, rather than the evidence counsel hoped to admit.

circumstances, affirmance may very well be contrary to child's well being.[10]

¶ 44. I would be more willing to look beyond the problematic findings in this case if the evidentiary record compelled a CHINS finding without regard to the trial court's actual findings. But it does not. This is not a case of abuse. There is no suggestion that either parent raised a hand against child or allowed another to do so. Nor are there findings that, apart from the issues concerning his medical care, these parents neglected child's basic physical, developmental and emotional needs. Setting aside for a moment the trial court's appropriate concerns about the parents' attentiveness to child's medical needs, the trial court's findings do not suggest a broken parent-child bond, an unacceptably unstable home environment, a lack of attentiveness to child's educational or developmental needs, a failure to provide appropriate nourishment or shelter, physical or emotional dangers to child in his home, or exposure to domestic violence, drug abuse or other risks commonly seen in CHINS cases.[11] Nobody questions that child and his parents had a loving relationship. At the end of the merits hearing, the trial court acknowledged that the child was "confused, unhappy, doesn't want to be where he is, wants to be home with [his parents]."

¶ 45. Even with respect to child's medical care, this is not an open-and-shut case. In addition to ordinary medical care, child's condition requires regular catheterization, weekly shots and evaluation of his growth and surgical site, and quarterly testing with a

---

[10] Moreover, the consequence of reversal would not be returning child to a dangerous situation without recourse. More than a year has passed since the CHINS hearing at the crux of this appeal. I do not know whether child is still in DCF custody or whether, as contemplated by the disposition plan, child has returned to his parents' custody. If the former, and if the State had evidence based on the parents' ongoing conduct that a return to his parents' custody would pose a substantial danger to the health, welfare, or safety of child, the State would be free to take appropriate action. 33 V.S.A. § 5308(a).

[11] As noted above, the trial court's written finding that mother has "admitted a substance abuse history but has yet to follow through with treatment" was not supported by the evidence. The trial court made two terse oral findings at the end of the merits hearing relating to stability and substance abuse: "[t]he family suffers from instability," and "[t]here is substance abuse." Although family instability and parental substance abuse are often factors supporting a CHINS order, in this case neither of the trial court's conclusory statements provides enough detail, or shows enough of a connection with child's welfare, to add support to the trial court's ultimate CHINS finding.

nephrology specialist at FAHC. Nobody disputes that parents were appropriately catheterizing the child. Child's pediatrician testified that parents routinely contacted her when they had concerns about child's health, and that parents follow-up and reschedule when they occasionally miss scheduled appointments due to transportation problems. Child's pediatrician testified that there is some flexibility with respect to the administration of the weekly shots, and that child generally needs the shots within one to two weeks. The visiting nurse who had visited the family, on average, once a week for four and one-half years for the purpose of giving these shots and evaluating his progress, identified only a handful of occasions when she was not able to provide child's weekly shot and evaluation on the scheduled date. She did not testify that on these several occasions, as a result of the missed weekly appointment, child went without the shots beyond the acceptable two-week window.

¶ 46. Given the above, the State's CHINS case necessarily rests almost entirely on the parents' failure to get child from northern Franklin County to Burlington for regular quarterly lab tests and appointments with specialists. In particular, child did not see the specialist between September 2010 and June 2011 — a far longer period than the medically required three months. Parents then missed a September 2011 appointment and child did not see the specialist until November 2011. Again, the approximate five-month gap was substantially longer than appropriate. Parents called FAHC in advance to reschedule several January 2012 appointments, but had a still-timely February 2012 appointment on the books when DCF sought custody through a temporary-care order. The State's decision to seek custody of child thus rested almost entirely on a nine-month gap in specialist evaluation between September 2010 and June 2011, and a five-month gap — two months longer than the required three-month interval — between June and November of 2011.

¶ 47. Parents' failure to timely schedule and bring child to quarterly appointments with the specialist is no small matter. It is clear from the record that his medical condition is serious, and the risk of harm resulting from undetected changes in child's lab values is significant. But given parents' attentiveness to child's daily catheterization regimen; their compliance, with very few exceptions, with weekly visiting nurse monitoring and administration of shots; their demonstrated ability to identify potential

problems and willingness to contact child's pediatrician when necessary; and the lack of evidence of actual harm to child as a result of the delays, although a court *could* make a CHINS finding, it is not compelled by this evidence to do so.

¶ 48. Moreover, the State's response here was draconian. At the outset, rather than seeking a conditional custody order subjecting the parents to close state supervision with respect to child's visits to medical specialists, the State removed child from his home and sought custody. See 33 V.S.A. § 5308(a); *id.* § 5308(b)(1) (requiring return of child to parents absent finding that return home would be contrary to child's welfare, and identifying conditional custody order with parents as preferred alternative approach following temporary-care hearing). Then, the State sought a CHINS order and a disposition that contemplated continued foster care for an indeterminate time. Rather than placing child with his parents and mobilizing its resources to ensure that the parents took him to his quarterly appointment with the specialist — an approach that would have addressed the specific harm warranting State intervention in the first place without triggering a host of new harms — the State promoted a plan that severed the day-to-day connection that cements the parent-child bond. This was not a brief period of foster care; by the time of the disposition hearing in this case, child had been living away from his home and apart from his parents for more than four months, and the disposition order contemplated an additional period of foster care. The risk to child's physical health from his parents' failure to get him to the specialist was real, but the risk to the young child's mental health and well being as a result of his removal from a loving and otherwise safe and appropriate home and placement in foster care is also substantial and cannot be ignored.

¶ 49. I realize these concerns about the State's response go more to the question of disposition, and that the focus of father's appeal is the trial court's merits decision. But this case highlights the gravity of a CHINS finding and the potential consequences for parents and child of a CHINS finding lacking the necessary support. For the above reasons, I respectfully dissent.

¶ 50. I am authorized to state that Justice Skoglund joins this concurrence and dissent.