NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 32

No. 2017-339

| | |
|---|---|
| In re M.L., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Addison Unit,<br>Family Division |
| | February Term, 2018 |

Samuel Hoar, Jr., J.

Katina Francis Ready, Montpelier, for Appellant Mother.

David Tartter, Deputy State's Attorney, Montpelier, for Appellee State.

PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Grearson, Supr. J.,
Specially Assigned

¶ 1. **ROBINSON, J.** This case calls for us to determine whether the evidence and findings support the trial court's conclusion that a child with significant mental-health issues was a child in need of care or supervision (CHINS) because she was "without or beyond the control of . . . her parent, guardian, or custodian," or "CHINS-C." We conclude that a child with significant mental illness who cannot be safely cared for by a parent in the home is not CHINS-C if the parent has effectively exercised parental authority to ensure that the child's care is properly managed in another setting. Accordingly, we reverse the trial court's merits determination that M.L. is a child in need of supervision.[1]

---

[1] Mother also challenges the trial court's disposition order granting the Department for Children and Families (DCF) custody and an order requiring her to provide DCF with information

¶ 2.    On February 16, 2017, the State filed a CHINS petition alleging that thirteen-year-old M.L. was beyond mother's control.[2]  See 33 V.S.A. § 5102(3)(C) (defining CHINS, in relevant part, as a child who "is without or beyond the control of his or her parent, guardian, or custodian"). In its affidavit accompanying the petition, the State described the following events concerning M.L., which are largely undisputed.  M.L. had recently been charged with two delinquencies—unlawful mischief and domestic assault.  On January 20, 2017, a school counselor reported to DCF that M.L. had been identified as a victim of sexual assault at school.  The local police department became involved in the sexual assault investigation and had possession of her electronic device. M.L. threatened to harm herself if police, who were investigating the reported sexual assault, did not return her device.

¶ 3.    On January 23, mother showed a police officer and a DCF investigator M.L.'s journal, in which M.L. wrote about cutting and choking herself and engaging in hypersexual behavior with multiple boys.  Mother explained that she had locked up all of the sharp objects in their home, but that the child would use anything, dull or sharp, to cut herself—including earrings. That same day, M.L. became upset and threatened to kill herself and cut herself when mother would not return her electronic device.  A police officer took M.L. to Porter Hospital to be evaluated for hospitalization.  The next day, the Counseling Service of Addison County evaluated M.L. at the hospital and recommended a hospitalization at Northwest Family Institute (NFI). Mother was clear at that time that M.L. could not return home.  M.L. was admitted to NFI on January 24.

¶ 4.    On February 3, NFI concluded based on M.L.'s conduct, including glorifying her sexual behaviors, choking herself until she passed out, and cutting her arms, that M.L. no longer

---

identifying M.L.'s father.  Because we reverse the family division's merits decision, we do not address mother's challenges to the other two orders.

[2]    Mother was M.L.'s custodial parent, and no other parent has been identified or adjudicated.

met the criteria for continued stay at NFI and would have to be discharged. Mother opposed the discharge on the basis that M.L. was not ready.

¶ 5. On February 6, mother brought M.L. to University of Vermont Medical Center (UVMMC) to be screened for hospitalization again. At that time, M.L.'s arms were cut up and she was threatening suicide. M.L. stayed at the UVMMC emergency department for five days before she could be admitted to the Brattleboro Retreat. On February 10, M.L. was admitted to the Brattleboro Retreat.

¶ 6. On February 14, a clinician at the Brattleboro Retreat recommended long-term residential treatment for M.L., and against M.L. returning to her home. The clinician explained that because this was a first admission for M.L., and she had not exhausted outpatient services, she would not be able to access a residential placement through the Department of Mental Health. The clinician opined, "I believe DCF custody would be the only available mechanism for securing a residential placement." On February 15, mother indicated that she would not support M.L. returning to her home at that time.

¶ 7. The affidavit accompanying the CHINS petition indicated that DCF was seeking a CHINS-C adjudication because of M.L.'s threats to kill her family, her mental instability, her sexualized and self-harming behaviors, her inability to keep herself safe, and mother's inability to parent M.L. and keep her safe at home.

¶ 8. Based on the petition and accompanying affidavit, the family court entered emergency and temporary orders placing M.L. in DCF custody.

¶ 9. The court held a CHINS merits hearing on April 17, 2017. Following the presentation of evidence, the family court adjudicated M.L. as CHINS in what the court called "a very close call." Applying the applicable preponderance-of-the-evidence standard, the court concluded "by the slimmest of margins" that M.L. was unmanageable and beyond the control of mother.

3

¶ 10.    In its on-the-record findings, the court found that there had been recent incidents of M.L. harming herself. The court found that, although DCF was involved in the case at the time M.L. was sent to NFI, the NFI admission was initiated by mother. After an approximately week-long hospitalization, M.L. returned home and immediately engaged in the same self-harming behaviors, which resulted in mother taking her to the UVMMC emergency department. The court noted that this incident corroborated M.L.'s own refusal "to be manageable in the home." At UVMMC, mother made the decision to have M.L. admitted to the Brattleboro Retreat. Although mother made this decision reluctantly given concerns that she had about the Brattleboro Retreat, this was an appropriate decision by mother under the circumstances.

¶ 11.    When M.L. was at the Brattleboro Retreat, it was clear that the Retreat was not a long-term option and that residential placement was necessary. At the time DCF filed its petition, mother had preliminarily investigated residential placements for M.L. but had not gotten very far and had not identified a viable option for when M.L. could no longer remain at the Brattleboro Retreat. DCF concluded on March 15 that the Brattleboro Retreat was not a long-term option and that taking M.L. into state custody was necessary to allow DCF to explore an appropriate residential placement for M.L. At that time, mother did not think that M.L. was ready to return home or that she (mother) was in a position to care for M.L. at home because M.L. was unable to follow rules and keep herself safe. Mother had insurance through her work that would pay for M.L.'s residential placement, but she had not yet identified a residential placement. The day before DCF filed its CHINS petition, mother acknowledged to the DCF investigator—"perhaps not fully understanding the extent of the implications of that decision"—that DCF custody was the best option because M.L. could not be controlled. On the basis of these findings, the court concluded that M.L. was CHINS-C.

¶ 12.    Throughout the merits hearing, the family court struggled to understand the urgency of the timing of DCF's petition. The court recognized that, given more time, alternatives to DCF

4

custody may have been found, but, in the end, the court relied on DCF's judgment that the best way to arrive at a long-term placement for M.L. was to have her taken into state custody.

¶ 13.   On appeal, mother argues that the evidence did not support the trial court's CHINS determination because mother had made, and was in the process of making, all appropriate arrangements for inpatient psychiatric care for M.L. at the time of the CHINS petition.

¶ 14.   Our caselaw offers little guidance regarding interpretation of the prong of the CHINS definition applicable to the State's petition in this case. The definition of a "[c]hild in need of care or supervision" includes "a child who . . . is without or beyond the control of his or her parent, guardian, or custodian." 33 V.S.A. § 5102(3)(C) (CHINS-C). This Court has had scant opportunity to apply this provision, and, when we have, we have offered little analysis. See In re B.B., 155 Vt. 365, 370, 584 A.2d 1126, 1128 (1990), abrogated on other grounds by In re D.D., 2013 VT 79, 194 Vt. 508, 82 A.3d 1143 (concluding without discussion that "[t]he fact that a child refuses to return home after staying with a relative for a short period of time with the parents' permission cannot support the conclusion that the child is without or beyond the control of the parents"). In the context of this case, several broad principles guide our assessment.

¶ 15.   First, the fact that the care of a child with significant mental illness cannot be safely managed in the parent's home does not in itself render the child beyond the parent's control if the parent is exercising parental authority to ensure that the child's care is safely managed in an appropriate setting. The goals of the CHINS statute support this assertion. The Legislature has indicated that the laws governing juvenile proceedings should be construed in accordance with the purpose of providing "for the care, protection, education, and healthy mental, physical, and social development of children coming within the provisions of the juvenile judicial proceedings chapters." 33 V.S.A. § 5101(a)(1). Moreover, the Legislature's policy is "to preserve the family and to separate a child from his or her parents only when necessary to protect the child from serious harm or in the interests of public safety." Id. § 5101(a)(3). If parents are unable to meet a child's

mental-health needs and manage the child's associated behaviors in the home setting and accordingly arrange for the child to receive care or treatment in an appropriate residential setting, the child's safety and well-being are not jeopardized by the parents' continued exercise of legal authority as parents. State intervention in derogation of the parent-child relationship is only required when the parents have not effectively secured the child's safety and well-being and the State must accordingly step in to do so.

¶ 16.    Second, in evaluating the State's CHINS petition, we focus on the circumstances at the time the State filed the petition. This is always true in CHINS cases, regardless of the type of CHINS case. See, e.g., In re D.T., 170 Vt. 148, 156, 743 A.2d 1077, 1084 (1999) ("The issue before the family court at the merits stage of a CHINS proceeding is a determination of whether, at the time of the filing of the petition, the juvenile is a child in need of care and supervision."). The circumstances leading up to the filing of the CHINS petition may be relevant to the court's assessment, but the question before the court is still whether the child was CHINS "at the time of the filing of the petition." In re M.M., 2015 VT 122, ¶¶ 23-24, 200 Vt. 540, 133 A.3d 379 (quotation omitted). If a child is clearly not without or beyond parental control at the time of the CHINS petition, the child may still be CHINS-C if the evidence supports the conclusion that the child is at imminent risk of being without or beyond parental control if the State does not step in to assert control. Accordingly, past events, coupled with evidence of current circumstances and plans may be relevant to the CHINS-C determination. But the question is not whether the child has, at any time, been without or beyond parental control.

¶ 17.    Third, in determining whether a child in this context is beyond a parent's control, the proper inquiry is not whether the parent has acted with good intentions or tried hard enough to protect the child. The proper inquiry is whether the child is protected. If, at the time of the CHINS petition, the child is at risk due to the inability of a parent to effectively establish control over the care of the child, despite reasonable and well-intentioned efforts by the parent to do so, the child

6

may be CHINS notwithstanding the parent's efforts, and State intervention may be warranted under chapter 53 of Title 13. The same legislative policies underlie this general principle as the first consideration above: the goal of the law is to protect the health and well-being of children.

¶ 18. Fourth, in determining whether a child is beyond a parent's control, the question is not whether the State offers a better treatment plan for the child than the plan the parent is pursuing, or whether a merits determination will open the door to treatment options directed by the State that would not be available to mother. Although a parent may stipulate to a merits finding based in part on such considerations, 33 V.S.A. § 5315a, in a contested case, the court must determine by a preponderance of the evidence that the child is in fact CHINS under the applicable definition. 33 V.S.A. § 5315. Considerations about the resources or treatment opportunities available through the State in the event of a CHINS merits determination, or available to the State if it assumes custody of a child, have little if any relevance to the question whether a child is beyond a parent's control. Accordingly, even if well-intentioned, in a contested situation, a court should not predicate a CHINS-C finding on a desire to open treatment doors to a child with treatment needs; the focus of the court's merits determination in the first instance must be whether the child meets the criteria for CHINS-C—namely, whether the child is beyond parental control.

¶ 19. With these considerations in mind, we conclude that the trial court's CHINS-C determination is not supported by the evidence or its findings. At the time the State filed the CHINS petition in this case, M.L. was in a residential facility under the care of mental-health professionals. Pursuant to the initiative and authority of her mother, she had been cared for in a protected environment for over ten days—first at UVMMC, and then at the Brattleboro Retreat. Although her mother was not managing her care in the home, having appropriately recognized that M.L.'s needs called for a higher level of care, her mother had ensured that M.L. would be safe by arranging her admission to the Brattleboro Retreat. This was not a case in which a child was in jeopardy due to the parent's inability to effectively assert control over the management of the

7

child's care such that the State needed to step in to protect the child. The parent took the necessary steps to keep the child safe and succeeded in doing so.

¶ 20. Moreover, there is no evidence that M.L. was at risk of imminent harm on account of mother's continued exercise of her parental authority. Although a clinician at the Brattleboro Retreat opined that the child needed a long-term residential placement, there was no evidence that the Brattleboro Retreat was on the verge of discharging M.L. without such a plan in place. Nor was there any evidence suggesting that mother planned to remove M.L. from the protected environment of the Brattleboro Retreat to bring her home. In fact, the evidence and findings were to the contrary: mother recognized that she could not manage M.L.'s care in the home and was seeking an appropriate residential placement for the child. Cf. In re J.T.S., 169 Vt. 620, 621, 733 A.2d 86, 88 (1999) (mem.) (affirming award of custody to State at disposition in CHINS-C case where father's continued commitment to home placement would create risk of interruption of treatment). The fact that mother did not have a specific residential program identified at the moment that the State was ready to begin its own process of searching for a residential placement with a State contractor does not mean that M.L. was out of mother's control such that she faced a risk of harm. She was just as safe, protected, and controlled on that date as she had been the prior day, before clinicians at the Brattleboro Retreat recommended searching for an alternate placement.

¶ 21. To the extent the trial court relied on the fact that mother could not manage M.L.'s care at home in concluding that M.L. was beyond mother's control—and the record suggests that this factor weighed heavily in the court's analysis—for the reasons noted above, that fact alone does not support the court's CHINS-C determination. The undisputed evidence is that mother accessed the necessary treatment—first at NFI, then at UVMMC, and finally at the Brattleboro Retreat—to ensure that M.L. would be safe and cared for outside of the home. Likewise, the fact that M.L. lapsed into her unsafe behaviors at home following the NFI admission cannot support

8

the conclusion that ten days later she was beyond parental control. The question here is not whether M.L. had significant behavioral challenges that prevented her from remaining at home, but is rather whether mother maintained control over her care in an appropriate setting and protected her from the consequences of her mental illness. When M.L. resumed unsafe behaviors upon returning home following the NFI admission, mother ensured that she was safe and protected in a supervised medical setting—first at UVMMC and then the Brattleboro Retreat. Mother did not allow or require M.L. to return home during the ten days prior to the State's CHINS petition.

¶ 22. Finally, to the extent the trial court's determination was driven by a desire to open the door to the State to explore and fund residential treatment opportunities that would not otherwise be available to M.L., its analysis was problematic for a couple of reasons. First and foremost, it focused on the wrong question by jumping ahead to disposition considerations before addressing on its own terms the threshold merits question: was M.L. without or beyond parental control at the time the State filed its petition when she was hospitalized at mother's behest in the Brattleboro Retreat.

¶ 23. Moreover, this was not charged as a CHINS-B case of parental medical neglect based on mother's failure to meet M.L.'s medical needs. Cf. In re D.D., 2013 VT 79, ¶¶ 36-37 (affirming CHINS determination where parents failed to follow through on treatment required for child's serious kidney disorder). To the extent that the State's theory here was that, as of the date of the petition, mother was failing to properly address M.L.'s needs through appropriate medical planning, and State intervention was accordingly necessary to protect M.L., the State could have sought redress through a CHINS-B petition and then presented evidence to support a CHINS-B finding. See 33 V.S.A. § 5102(3)(B) (defining "[c]hild in need of care or supervision" to include a child who "is without proper parental care or subsistence, education, medical, or other necessary care for his or her well-being"). Even if the evidence could support a CHINS-B finding—which it would not on this record—the State cannot use a CHINS-C petition to advance what is essentially

9

a medical neglect argument focusing on whether mother's medical treatment planning is adequate to meet M.L.'s needs, rather than on whether M.L. is (or imminently will be) beyond mother's control. See In re B.B., 155 Vt. at 370, 584 A.2d at 1128-29 (indicating unwillingness to uphold CHINS adjudication on theory not reflected in CHINS petition).

¶ 24. We do not doubt that the State was motivated by its commitment to M.L.'s best interests, and that the trial court likewise sought to address a challenging situation in a way that would promote this child's well-being. As we have recognized, the power allocated to the State to establish procedures to protect the welfare of children is "awesome." In re N.H., 135 Vt. 230, 234-35, 373 A.2d 851, 855 (1977). "Accordingly, any time the State seeks to interfere with the rights of parents on the generalized assumption that the children are in need of care and supervision, it must first produce sufficient evidence to demonstrate that the statutory directives allowing such intervention are fully satisfied." Id. at 235, 373 A.2d at 855. For the reasons set forth above, we conclude that the State's evidence, and the trial court's findings, do not support the court's determination that M.L. was beyond parental control. We accordingly reverse the CHINS-C merits decision.

Reversed.

FOR THE COURT:

_____

Associate Justice

10