NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 78

No. 2016-018

In re J.W., Juvenile

Supreme Court

On Appeal from
Superior Court, Franklin Unit,
Family Division

May Term, 2016

Alison S. Arms, J.

Matthew Valerio, Defender General, and Katina Francis Ready, Appellate Defender, Montpelier, for Appellant Father.

James A. Hughes, Franklin County State's Attorney, St. Albans, for Appellee.

PRESENT: Skoglund, Robinson and Eaton, JJ., and Grearson and Hoar, Supr. JJ., Specially Assigned

¶ 1. **SKOGLUND, J.** In this case, the trial court concluded by a preponderance of the evidence that J.W. was a child in need of care or supervision (CHINS) because mother would not adequately protect J.W. from father if the child was returned to mother's care. Mother has not appealed. Instead, father appeals, arguing that the court "usurped the executive role of investigation and prosecution" by taking judicial notice of his criminal record and filings related to a relief-from-abuse (RFA) order that mother obtained against him. He further contends that the court's findings do not support its conclusion. We affirm.

¶ 2. J.W. was born in June 2012. In May 2015, the Department for Children and Families (DCF) filed a CHINS petition and J.W. was taken into temporary DCF custody. The

affidavit accompanying the CHINS petition alleged, among other things, that: mother and J.W. were homeless; father was incarcerated; father had a history of domestic violence against mother; father had been substantiated for sexual abuse and had been charged with and convicted of prohibited acts for groping a juvenile; both parents had a history of substance use; father drove while intoxicated with J.W. in the car; and, in the presence of the affiant, father arrived intoxicated at a home where mother and J.W. were staying, and threatened to kill himself and others, resulting in father's arrested, and subsequent guilty plea to unlawful mischief, providing false information to a law enforcement officer, and two counts of violating conditions of release. The affidavit also alleged that mother had obtained an RFA order against father on behalf of herself and J.W.; mother was reportedly using substances not prescribed to her and misusing her prescription medication; mother's medication and other dangerous items were accessible to J.W.; and mother failed to follow through on a substance abuse assessment.

¶ 3. Following a three-day merits hearing, the court concluded that although many of the serious allegations in the CHINS petition had not been established, the State had proved by a preponderance of the evidence that J.W. was CHINS because mother was unwilling to protect J.W. from father who mother believed to be dangerous to J.W. The court made numerous findings in support of its conclusions, including those set forth below.

¶ 4. As to the allegations about mother's prescription drug use and other matters, the court found that mother illegally possessed prescription medication while J.W. was in her care; mother did not seek out or follow through with a substance abuse assessment or appropriate treatment; and mother struggled to provide stable housing for J.W. The court determined, however, that the State failed to show that any of these circumstances caused harm to J.W. The court similarly found that the State failed to show that mother failed to adequately supervise J.W. while staying at a domestic-violence shelter.

2

¶ 5.    The court reached a different conclusion with respect to father's involvement in J.W.'s life. The court found that mother had made numerous alarming allegations about father in an RFA petition that she had filed in late March 2015, shortly before the CHINS petition was filed. A final RFA order had issued in April 2015 without findings based upon the parties' stipulation. Mother stated in her petition that father was a danger to her and J.W. and that she was fearful of father's release from jail. In her affidavit in support of her complaint, mother described an incident where father was drunk and belligerent and told her it was "time for you to die," that he "oughta smash your brains all over that post," and that "I'll put your daughter in a wheelchair and make you suffer the rest of your life." She reported that the incident occurred in August of 2014. When prompted by the complaint form to describe the most serious incident that caused her to apply for an order, she related an incident that occurred in 2013. She stated that just after father was released from jail, he strangled her until she passed out; this occurred right after she finished nursing J.W. In another incident, mother alleged that in 2011, after an argument about father going to buy drugs, father threatened to burn down their home if mother was not there upon his return. The home was burned down shortly thereafter after father had removed his belongings from the home. Additionally, mother alleged that in September 2014, father smashed a car window when mother tried to leave with J.W. Finally, mother recounted that in September 2014, father allegedly left J.W. in a car unsupervised. J.W. got out of her car seat and climbed out the window that had been smashed the day before. A woman saw J.W. wandering alone in the parking lot and called 911.

¶ 6.    At the CHINS merits hearing, mother testified that she did not actually feel threatened by father. She stated that she sought the RFA because DCF told her it was part of her safety plan and that she understood she needed it to obtain a housing voucher. Mother testified several times that DCF was concerned that she would not protect J.W. from father. Mother professed not to have read the affidavit that she filed or to remember what she had included in

3

the RFA petition. Mother also testified that some of the allegations were just dreams that she had, and she stated that she did not recall many of the other allegations. The court rejected as not credible mother's statement that she did not remember reading or filing the petition, her suggestion that she had been coerced into filing the RFA petition, and her disavowal of the allegations in the RFA petition.

¶ 7. Mother did admit at the CHINS merits hearing that father had threatened to burn all of her belongings, and in fact, her house had been burned down. She also testified that father had smashed the car window when she had tried to leave with J.W. Mother admitted telling the domestic-violence counselor, who wrote out the affidavit that mother signed, about the car incident with father and J.W. She testified that she believed it to be true. Mother denied stating that she was fearful of father's release from jail, however, and testified that she did not feel that J.W. was unsafe with father at all.

¶ 8. The court credited mother's assertion in the RFA affidavit that in late 2014, she allowed J.W. to be alone in a car driven by father despite all of the concerning events that she had recounted in the RFA affidavit. It found credible mother's description of father smashing the car window. The court explained that in the RFA petition mother claimed she "was concerned about J.W.'s safety around father"—rightly so, the court found, given his criminal record and the events mother alleged—yet she still allowed J.W. to be in father's presence unsupervised.

¶ 9. The court found that in the months after the car incident, mother appropriately obtained an RFA order and agreed to a safety plan wherein father was not allowed to have unsupervised contact with J.W. The court could not credit mother for seeking the RFA, however, because she claimed at trial that she sought the RFA order only to be eligible for a housing voucher. And, prior to the hearing on the CHINS petition, mother had moved to vacate the RFA order, stating that she wanted to "move on to have a life as a family with our daughter."

4

¶ 10. Based on these and other findings, the court did not believe that mother would adequately protect J.W. if custody were to be returned to her. It concluded that the State had shown by a preponderance of the evidence that: (1) mother believed father to be dangerous to J.W. based on specific, factual circumstances she allegedly observed and (2) mother still sought to expose J.W. to father. The court thus concluded that J.W. was CHINS. This appeal by father followed.

¶ 11. Father argues that the court exceeded its authority by "gathering information outside the record evidence to supplement the State's case." According to father, the court "determined that the State failed to meet its burden of proof on the claims in the petition." Instead of denying the petition, father argues, the court assumed the role of a prosecutor and reviewed court records that had not been placed into evidence in an effort to prove the State's case. As to his criminal history, father asserts that "there is no telling from this record when the court obtained the records it speaks of or to what extent it relied on them to form its opinion."

¶ 12. To begin, father's characterization of the proceedings below is flawed. A clearly frustrated court found that the State failed to prove many allegations in its CHINS petition. The court noted that it was vital that the State do the work of putting together a sufficient case to support its intervention into the parent-child relationship and, "for most of the allegations in the petition, the State failed to do so." The court found that while mother illegally possessed prescription medication for a brief time while J.W. was in her care and while she had struggled to provide stable housing for J.W., the State "failed to show that any of these circumstances caused harm to J.W." The court then turned its attention to father's actions in the child's life and mother's responses to them.

¶ 13. A key piece of evidence upon which the court relied was an RFA file that included a final order that mother obtained against father on April 20, 2015. Father suggests the court erred in taking judicial notice of this file and basing a determination of CHINS on the

5

judicially noticed material. At the outset, it is important to clarify that the court misspoke when it said it was taking judicial notice of the RFA file because the file was actually entered into evidence. After the testimony at the merits hearing ventured into the existence of the mother's application for an RFA order, the court obtained the file, allowed all parties to make copies of it, and recessed the hearing to allow them all time to review it. When the hearing resumed, the attorney for J.W. offered the file into evidence. The court accepted it over the objection of mother's attorney, who argued it was not relevant to the merits and the objection of father's attorney, who argued it should be excluded under Vermont Rule of Evidence 403 as unnecessarily confusing and prejudicial. Therefore, the arguments posed by father concerning the court's improper taking of judicial notice of the RFA file are of no moment.

¶ 14. Nonetheless, we recount what is evident in the record. The transcript shows that on the first day of the CHINS merits hearing, following testimony about why DCF opened its case and testimony about mother's behavior at a domestic-violence shelter, a discussion arose about the RFA order that mother had obtained against father. Mother had agreed to a safety plan that contained, among other things, an expectation that she would not allow father around J.W. and that she would apply for an RFA order. Mother had expressed concerns to a DCF social worker about father's behavior, especially when he was drinking. DCF wanted to make sure that mother could keep J.W. safe in light of mother's disclosures about father's behavior.

¶ 15. Mother testified that she did not think she needed an RFA order, but that she obtained one because she needed it to secure a housing voucher and because DCF required it as part of a safety plan. She claimed a counselor wrote out the affidavit in support of the RFA petition. She testified that all the information in it was true "to the best of [her] knowledge," but said she had not been given a copy of the affidavit. When asked if she had signed the affidavit, mother responded that she had "signed something." Mother subsequently testified that some things written in the RFA affidavit were not true. She questioned whether she had actually

6

signed the affidavit. At that point, mother's attorney objected, stating "unless someone's going to produce the affidavit," it was unknown if mother had signed it and what information it contained. The court produced the RFA file and permitted the parties to copy same. As noted above, the court took the file into evidence.

¶ 16. Even if the court indicated that it "had the file" prior to admitting it as an exhibit and "kn[ew] what the RFA [said]," this was a significant issue raised at the hearing. The court then produced the file at the parties' request and allowed them to make copies of it. We discern no harm. As indicated above, mother's attorney examined mother about the RFA materials in detail. Mother was cross-examined about these materials by J.W.'s attorney and by father's attorney. The record demonstrates no error, and no "usurping" of the prosecutor's role as claimed by father. In reaching its conclusion that J.W. was CHINS, the court could properly rely on mother's assertions in the RFA affidavit that the court had admitted into evidence and her testimony at the merits hearing.

¶ 17. We thus turn to the court's statement that it took "judicial notice of [father's] extensive criminal history, including convictions for prohibited acts, unlawful mischief, and multiple counts of violation of abuse prevention orders and charges for lewd and lascivious conduct with a child and arson." The court provided the trial court docket numbers for these cases, which reflect the charges referred to and defendant's guilty plea to lesser charges.

¶ 18. Father agrees that the court may take judicial notice of the fact of an order but not the substance of any findings contained in such order. See V.R.E. 201 (providing that court may take judicial notice, whether requested or not, of fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); In re T.C., 2007 VT 115, ¶ 16, 182 Vt. 467, 940 A.2d 706 ("The existence of a prior order is an appropriate subject of judicial notice."); Miller v. Miller, 2008 VT 86, ¶ 31, ¶ 31 n.11, 184 Vt. 464, 965 A.2d 524 (taking judicial notice of family court order

7

issued during pendency of appeal and of fact that mother had received particular sentence in federal district court); see also Lane v. Ballot, 330 P.3d 338, 342 n.16 (Alaska 2014) ("Courts may take judicial notice of criminal convictions pursuant to Alaska Rules of Evidence 201 and 203."); cf. In re A.M., 2015 VT 109, ¶ 34, __ Vt. __, 130 A.3d 211 (stating that court could properly take judicial notice of findings from earlier stage of juvenile proceeding and rely on them in later stage of proceeding). Father does not dispute that he has an extensive criminal history or that he was charged with the listed crimes and convicted of the crimes identified by the court. Instead, he asserts that it is not clear here if the court simply considered the existence of the convictions and the underlying charges, or whether it delved further into the underlying facts of the convictions and unconvicted allegations.

¶ 19.    At the outset, we emphasize that the burden is on the State to prove its case. The State referred to father's criminal history in the CHINS affidavit, including mentioning specific crimes with which he was convicted, and yet it inexplicably produced no evidence to support these allegations at the merits hearing. Certainly, it would have been preferable for the State to have presented the court with the records of father's convictions or ask the court to take judicial notice of the criminal history. Finding mother's disavowal of the alarming allegations in her RFA petition to not be credible, it appears the court went outside the record before issuing its decision and added specificity to the record with the captions and docket numbers of the convictions discussed. Assuming arguendo that the court erred in going outside the record to take judicial notice of father's extensive criminal history, including listing several specific charges and convictions, any error was harmless here.

¶ 20.    First, it was evident from the proceedings below that father had a criminal history. The court recognized at a May 2015 temporary-care hearing that father was not requesting custody of J.W. because he had just been released from jail. At a June 2015 pretrial hearing, father indicated that he had been sentenced for various crimes several months earlier, including

8

violation of probation, and that he was currently on furlough. He admitted that alcohol abuse drove those convictions and that he had J.W. with him at the time. At the State's request, the court ordered supervised visitation with father given, among other things, that father had a prohibited-act conviction involving a teenage girl victim. By the time of the merits hearing, father was incarcerated and had to be transported to the hearing. By his own testimony, he had been incarcerated for twenty months prior to the filing of the CHINS petition.

¶ 21. At the merits hearing, a DCF investigative social worker testified that she became involved with the family after receiving a report that father had been driving with J.W. in the car while he was intoxicated. The social worker also related that when she met with mother to discuss this report, mother indicated that she had been called by police to pick up J.W. but that she did not have information about whether father was intoxicated at the time. During her conversation with mother, father arrived at the home, intoxicated, and he was subsequently arrested and incarcerated. The social worker testified that, following that home visit, father was incarcerated and a case was opened because of the family's high-risk score, which considered both the current concerns and prior interventions with the family. On cross-examination, the social worker clarified that she did not know if father had been charged with driving-while-intoxicated, merely that there was a report made that he was intoxicated while he had J.W. in the car with him. When asked if she was aware of a charge that stemmed from that allegation, the social worker testified that she knew he was charged with something but wasn't sure if it was a violation of probation or something else.

¶ 22. A second social worker reiterated that father was incarcerated at the time that she began working with the family in February 2015. Given the concerns about father, she formed a safety plan with mother, which included an expectation that mother would not allow father around J.W. and that she would apply for a RFA against father. Mother was staying at a domestic-violence shelter and she obtained an RFA against father. Mother expressed in several

9

conversations that she wanted to have an RFA and was concerned about father and his behavior, especially when he was drinking. Obviously, mother's allegations about father's behavior, set forth in the RFA affidavit and testified to at trial, formed a significant part of the court's decision. The record shows that father's criminal history, which included multiple incarcerations at least one of which was twenty-months long, was not a novel issue discovered by the court on its own initiative.

¶ 23.     More importantly, the court did not rely on father's criminal record to any significant degree other than, perhaps, as corroboration of mother's allegations about his behavior. We reject father's assertion that the court used his criminal records "to form a primary basis of its decision." As reflected above, the court based its decision on <u>mother's</u> belief that father was dangerous to J.W. based on specific, factual circumstances she allegedly observed, and mother's desire to continue to expose J.W. to father. While father contends that his behavior did not demonstrate that he posed a danger to J.W., the court concluded otherwise. The court's conclusions are grounded in the evidence and they reflect the court's evaluation of the weight of the evidence and the credibility of witnesses, matters reserved exclusively for the trial court. See, e.g., <u>Cabot v. Cabot</u>, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997) ("As the trier of fact, it [is] the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence.").

¶ 24.     The court could reasonably conclude that mother's not-credible disavowal of her prior allegations of violence and abuse was relevant and significant, and that it spoke to mother's failure to comprehend the safety issues father presented to J.W. and her disinclination to keep J.W. safe, including shielding her from violence directed toward mother in J.W.'s presence. Mother's failure to protect J.W. from an individual she believed to be dangerous supports a conclusion that J.W. was "without proper parental care or subsistence, education, medical, or other care necessary for . . . her well-being." 33 V.S.A. § 5102(3)(B). See, e.g., <u>In re M.B.</u>, 158

10

Vt. 63, 70, 605 A.2d 515, 519 (1992) (concluding that evidence that child was exposed to dangerous living conditions sufficed to support CHINS determination, as was evidence that indicated mother's continuing lack of supervision and care adequate to protect child's well-being); In re C.M., 157 Vt. 100, 103, 595 A.2d 293, 294-95 (1991) (concluding that fact that father had abused child and mother refused or was unable to keep child from being in father's company alone was sufficient, standing alone, to support CHINS finding as matter of law).

¶ 25. The court's key findings are supported by the evidence, and these findings support the court's conclusion that J.W. is CHINS. See In re L.M., 2014 VT 17, ¶ 18, 195 Vt. 637, 93 A.3d 553 (explaining that "[i]n juvenile cases, where the court has erred in admitting and relying upon certain evidence, reversal is appropriate only if the findings of the court, apart from the findings based on the improper evidence, d[o] not support the court's conclusions" (citing In re M.B., 158 Vt. 63, 69-70, 605 A.2d 515, 518-19 (1992) (no reversible error where trial court's conclusion based on testimony properly in evidence) (additional citation omitted)); see also In re D.D., 2013 VT 79, ¶ 34, 194 Vt. 508, 82 A.3d 1143 (reiterating that in juvenile proceedings, court's decision will not be reversed, even if some of trial court's findings are unsupported, "if the remainder of the court's findings, which are supported by the record, are sufficient to sustain the decision" (quotation and brackets omitted)).

Affirmed.

FOR THE COURT:

_____
Associate Justice