NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 16

No. 22-AP-242

| | |
|---|---|
| In re C.C., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Windham Unit,<br>Family Division |
| | March Term, 2023 |

Michael R. Kainen, J. (CHINS merits order); Elizabeth D. Mann, J. (disposition order)

Sharon J. Gentry and Zachary D. Hozid of Costello, Valente & Gentry, P.C., Brattleboro, for
  Appellant Mother.

Kristin Gozzi, Washington County Senior Deputy State's Attorney, Barre, for Appellee State.

Sarah R. Star, Middlebury, for Appellee Father.


PRESENT: Reiber, C.J., Eaton and Carroll, JJ., and Toor and Tomasi, Supr. JJ.,
         Specially Assigned


¶ 1.     **CARROLL, J.**  Mother appeals from the trial court's determination that C.C. was a child in need of care or supervision (CHINS). She argues that the court erred in admitting certain hearsay statements by C.C. concerning alleged sexual abuse by mother's boyfriend. We do not reach mother's arguments because, even excluding this evidence, the court's decision is amply supported by its remaining findings. We therefore affirm.

¶ 2.     C.C. was born in March 2014. On October 25, 2019, C.C. told her kindergarten teacher that she was snuggling with mother's boyfriend and he put his penis in her vaginal area.

In an interview with police, mother minimized the allegations, said she wanted to interview C.C. herself, and said that C.C. was making up stories.

¶ 3.     On October 29, 2019, the Department for Children and Families (DCF) filed a petition alleging that C.C. was CHINS and C.C. was taken into emergency DCF custody.  DCF alleged that boyfriend inappropriately touched C.C. under circumstances that mother should have been aware of, mother was in denial about the conduct, and mother therefore would not protect C.C. from future sexual predation by boyfriend.

¶ 4.     There was extensive motion practice leading up to the court's merits decision.  The court denied mother's motion to dismiss the CHINS petition.  The court also considered requests by the State and mother to admit C.C.'s hearsay statements under Vermont Rule of Evidence 804a. Following a hearing, the court admitted the statements as substantive evidence for purposes of the merits hearing.  The hearsay statements included C.C.'s disclosures about alleged sexual abuse to her kindergarten teacher on October 25, 2019, which the court considered the freshest statement. It also included C.C.'s hearsay statements made during DCF interviews on October 26 and October 29, 2019, which the parties stipulated should be admitted.  The court also admitted C.C.'s hearsay statements made to: a DCF social worker in mid-November 2019; a nurse practitioner in late December 2019; her father in early November 2019 and late December 2019; the school psychologist in early January 2020; a paraprofessional at the school in early January 2020; the assistant director of her afterschool program in early January 2020; and her maternal grandfather in early February 2020.  These disclosures all related to the incident disclosed to the kindergarten teacher.

¶ 5.     As required by Rule 804a, the court found that the statements were made by a child "[twelve] years of age or under," offered in a CHINS case, and "relate[d] to the sexual abuse of the child," and that the child was "available to testify in court or under [Vermont Rule of Evidence] 807."  V.R.E. 804a(a)(1), (3).  It considered the statements spontaneous and found no evidence to

2

suggest coercion or manipulation.  For reasons detailed in its decision, it found, with one exception, that the statements "were not taken in preparation for a legal proceeding," and "the time, content and circumstances of the statements provide[d] substantial indicia of trustworthiness."  V.R.E. 804a(a)(2), (4).[*]

¶ 6.    In reaching its conclusion, the court considered mother's assertion, raised in her second motion in limine, that it should exclude all hearsay statements that C.C. made after the CHINS petition was filed.  The court noted that Rule 804a contained an arraignment-day cutoff for statements to be used in criminal cases, but it had no such cut-off date for noncriminal cases. Mother cited In re D.T. and similar cases for the proposition that "[t]he issue before the family court at the merits stage of a CHINS proceeding is a determination of whether, at the time of the filing of the petition, the juvenile is a child in need of care and supervision."  170 Vt. 148, 156, 743 A.2d 1077, 1084 (1999).  The court explained that In re D.T. involved a child who was underweight at the time a CHINS petition was filed but who gained weight by the time of the CHINS merits hearing.  This Court held that the child's status at the time of the merits hearing did not undermine the findings that, as of the time of the petition, the parents were not meeting the child's needs.

¶ 7.    The trial court found D.T. and the similar cases cited by mother inapposite.  It explained that the statements that C.C. made after the CHINS petition related to what boyfriend allegedly did prepetition.  It analogized to a physical-abuse case where a doctor reviewed X-rays of a child after a CHINS petition was filed, noting that the issue was not when the doctor reviewed the X-rays but whether the injury occurred prepetition.  As indicated above, the court concluded

---

[*]    As indicated, the parties stipulated to the admission of DCF's October 29, 2019, interview of C.C.  The court found in its Rule 804a decision that "the circumstances surrounding the statements made in [this] interview cast doubt on their reliability."  Given the parties' agreement to its admission, however, and given that this was not a jury trial, the court admitted the interview and reserved  an evaluation of its weight for the merits hearing.

that C.C.'s hearsay statements about prepetition abuse could come in as substantive evidence. Mother filed a motion to reconsider, which was denied.

¶ 8. Following a three-day merits hearing in May and June 2021, the court determined that C.C. was CHINS. It incorporated by reference its denial of mother's motion to dismiss and its ruling admitting evidence under Rule 804a. Its decision reflects the following findings. Mother began dating boyfriend in 2014. Boyfriend was living in the basement of his parents' home, and mother and C.C. moved in with him. C.C. had a toddler bed in the basement. She would occasionally get into bed with mother and boyfriend to watch a movie or read books. When mother became pregnant with boyfriend's child in 2017, C.C. moved to a bedroom upstairs. C.C. would occasionally come downstairs and get into bed with mother and boyfriend.

¶ 9. In 2017, C.C. began having urinary incontinence issues at home but not at preschool. She had rashes that mother treated with ointment. At one point, mother became concerned about a sore on C.C.'s vagina and asked the child's primary care provider if there was a way to tell if the child was being sexually abused. The provider told mother about signs of sexual abuse and how to make a report. Mother denied to the provider that she was concerned about sexual abuse.

¶ 10. Mother had a son in March 2018. The family continued to live with boyfriend's parents and, during the warmer months, they stayed in a camper at a campground. In mid-October 2019, the family returned from the campground to boyfriend's parents' home. C.C. expressed being scared and nervous about sleeping on a different floor. In the early morning hours of October 25, 2019, C.C. came downstairs and got into bed with mother and boyfriend. Later that day, C.C. disclosed to her kindergarten teacher that boyfriend sexually abused her.

¶ 11. October 25 was a "pajama day" at C.C.'s school. The children could wear pajamas, bring in stuffed animals, and watch a movie. C.C.'s kindergarten teacher testified that when she was setting up a video, a student asked if they would be watching a scary movie. C.C. said, "when

4

I am scared at night, I go down and get in bed with Mommy and [boyfriend] and we snuggle, he pulls down my jammy bottoms, and he snuggles with me, and he puts it right here," and she pointed to her private area. Then C.C. whispered in her teacher's ear, "penis." C.C. then started to cry and said, "I am going to be in big big trouble. I wasn't supposed to tell, I am going to be in big big trouble." A boy commented that it was gross, and C.C. responded, "no it's not, I like it." The teacher asked where mother was when this occurred, and C.C. said that mother was sleeping. The teacher contacted DCF.

¶ 12. Mother met with a DCF social worker and police investigators later that day. At that point, investigators did not provide mother with the specifics of their concerns. Mother told them that C.C. was making up lies. Mother nonetheless agreed that C.C. would stay with father through the weekend and that she and boyfriend would not try to talk to C.C.

¶ 13. DCF interviewed C.C. the following day and again three days later. The court derived little from the first interview beyond that C.C. liked to snuggle with boyfriend; it deemed the second interview a nullity. C.C. was also examined by a nurse. While the nurse was touching C.C.'s genital area, C.C. spontaneously stated "that feels good." The nurse found this to be an unusual statement in her experience. The nurse asked C.C. if there was someone she would be comfortable talking to and C.C. replied with the name of her kindergarten teacher.

¶ 14. The police and a DCF social worker interviewed mother again following their interview with C.C. At that point, they had also interviewed boyfriend. The DCF social worker told mother that C.C. reported that boyfriend touched her with his penis. Mother said that C.C. snuggled up with boyfriend if she wanted "daddy lovings." Mother replied that boyfriend would never take C.C.'s pajamas off. Mother was asked if she knew that boyfriend said he was naked on the morning in question and admitted to taking off C.C.'s pajamas. Mother was upset, cried, and said that boyfriend may not have had his bottoms on. Mother later said that boyfriend admitted to taking C.C.'s bottoms off because they were wet. Mother told the investigators that C.C. was not

5

being truthful and that she (mother) had stayed awake while C.C. was in her bed. The court found that mother was very protective of boyfriend and she showed no concern for C.C. She appeared more concerned about boyfriend's wellbeing than C.C.'s safety. Mother accused C.C. of lying and making up stories, and said she wanted to question C.C. Several days later, mother acknowledged that, after C.C. came to bed with them, mother fell asleep with boyfriend snuggling C.C.

¶ 15. At trial, mother testified that she did not remember what she told the police in late October. She said at trial that boyfriend was naked when C.C. came downstairs but that he then put on his underwear. Mother said she then got out of bed to attend to son. Mother also testified at trial that she would have expected C.C. to tell her if something happened. She said that, during her initial interview with DCF and police, she was stunned and wanted to find out more information. The court found that might be a plausible explanation, consistent with mother being protective of C.C., if mother did not continue to maintain that C.C. was lying in her subsequent meetings with DCF. The court rejected mother's trial testimony as not credible. It found what mother said to police shortly after C.C.'s disclosure more credible than what mother testified to in court.

¶ 16. The court also noted that on the day of C.C.'s disclosure to her kindergarten teacher, mother completed paperwork for an after-school program, which was given to C.C.'s teacher. One of the questions on the form asked if there was anything the program needed to know about the child. Mother wrote that C.C. "[was] trying to tell stories that aren't true and is learning about lying." Given the disclosure made by C.C. at school that day, the court found the timing of mother's attempt to diminish C.C.'s credibility suspect. The court also found that mother tried to shift blame about any possible sexual abuse to father. Mother testified that when she asked C.C.'s primary care provider about possible sexual abuse in 2017, her alleged concern stemmed from a time when father took C.C. to the bathroom. Mother did not communicate any such concern at the

6

time but instead raised it three years later in a case that focused on her boyfriend's alleged sexual abuse of C.C. The court found mother's revelation about father to be self-serving and lacking in credibility.

¶ 17. At the merits hearing, mother testified that "we won't ever know exactly what happened." She expressed that she did not know how much C.C. understood or how she understood it. Mother stated that she chose "to believe [C.C.'s] perceptions about it," "support her," and to "take every step I can to keep her safe." The court found that mother made a similar proclamation on cross-examination as an unresponsive answer to the State's question. The court found mother's statement rehearsed and inconsistent with the phraseology she used in her other testimony. It rejected this testimony as not credible. It noted that mother testified on cross-examination that she did not believe that boyfriend would intentionally sexually abuse C.C. Mother got engaged to boyfriend and continued to insist at DCF team meetings through 2019 that C.C. was lying.

¶ 18. There was also evidence that C.C. developed sores on her vagina in early December 2020, telling her father the sores were back again. The medical professionals at an urgent care facility suspected herpes and C.C. was physically examined at the hospital. C.C. made statements during this chain of events that were deemed reliable and admitted. The court found that C.C. had had a similar sore in the past and mother did not seek out treatment for it, despite taking the child to numerous doctor visits. The sore was later diagnosed as an aphthous ulcer, which the doctor described as being like a large canker sore on the vagina. It was sufficiently rare that there was not a well-defined mode of transmission.

¶ 19. Based on these and other findings, the court concluded that the State met its burden of proving that C.C. was CHINS. It recognized that "the focus of a CHINS proceeding is the welfare of the child." In re B.R., 2014 VT 37, ¶ 13, 196 Vt. 304, 97 A.3d 867 (quotation omitted). Mother was C.C.'s primary custodian at the time of the petition. The State argued that boyfriend

7

sexually molested C.C. Mother was apprised of this concern, and mother was protective of boyfriend and said that C.C. lies. The court found that the State proved the significant allegations in the affidavit filed in support of the CHINS petition and it concluded that C.C. was at risk of ongoing harm if she remained in mother's care.

¶ 20. In reaching its conclusion, the court considered mother's argument that it should not consider any evidence after the date the CHINS petition was filed, including C.C.'s additional disclosures, mother's statements that she believed boyfriend and that she had married him, and post-petition evaluations. The court found that this position defied both logic and case law. Citing In re M.L., 2018 VT 32, ¶ 16, 207 Vt. 128, 186 A.3d 618, the court explained that while "[i]t [was] true that post-petition events [could not] generally form the basis of a CHINS petition," it did not follow that evidence of post-petition events could not be considered in assessing if a child was CHINS at the time the petition was filed. The court explained that a post-petition investigation, or in this case a medical evaluation, might reveal additional evidence that could support or counter the conclusion that a child was CHINS at the time of the CHINS petition.

¶ 21. Mother also argued that a single instance of abuse or neglect might not support a CHINS finding if the custodial parent could not reasonably appreciate the risk. The court found that a reasonable person in mother's position would be cognizant that boyfriend posed a risk of harm to C.C. It found that after mother moved in with boyfriend, C.C. began having toileting problems at home but not at daycare. She had frequent vaginal irritation. Mother asked C.C.'s primary care provider about sexual abuse, and C.C. had symptoms that could be associated with sexual abuse, yet mother said she had no concerns. Mother knew that, on the morning in question, her five-year-old child was not wearing underwear and was snuggling with boyfriend who may or may not have been wearing underwear. This should have concerned mother.

¶ 22. When the risk was pointed out to mother, she did not move to protect C.C. Instead, she was protective of boyfriend. She said that C.C. was making up lies, denied that boyfriend

8

would take off the child's pajamas only to then recant when confronted with boyfriend's statement that he had done so. She then said it could not have happened because she was awake but several days later admitted that she fell asleep while C.C. and boyfriend were snuggling. The court found that by the time mother was confronted with C.C.'s disclosure and considering what she already knew, mother was, at best, exercising willful blindness.

¶ 23.   The court found that boyfriend touched C.C. with the intent to arouse his sexual passions. It concluded that the sexual abuse was capable of repetition and that mother could not be counted on to protect C.C. Mother continued to protect boyfriend and insist C.C. was lying. She got engaged to boyfriend, which shed light on mother's outlook during the petition period. Two years later at trial, mother used a rehearsed line to suggest that she would protect C.C. and even then, she qualified her statement to suggest that if boyfriend's penis did touch C.C.'s vagina, it was an accident. The court emphasized that this case did not present a close call. Mother knew or should have known that C.C. was at risk. Boyfriend sexually abused C.C. Mother's attempts to protect boyfriend and her disbelief of C.C. established that her judgment posed an ongoing risk to C.C.

¶ 24.   Following a hearing in May and June 2022, the court issued a disposition order continuing custody of C.C. with father. Father was awarded full legal rights and responsibilities in C.C.; mother was allowed visitation with C.C. with the requirement that there be no contact between C.C. and boyfriend. Mother now appeals.

¶ 25.   Mother first argues that the court should have excluded any hearsay statements that C.C. made after the date that boyfriend was arraigned on criminal charges. Mother also reiterates her argument that, because the court must determine if a child is CHINS as of the date of the petition, it cannot consider any hearsay statements that postdate the filing of a CHINS petition. Mother appears to argue that hearsay statements made after the filing of a CHINS petition are inherently untrustworthy and can never be admitted under Rule 804a. Assuming this argument

9

fails, mother asserts that the court erred in finding that the post-petition statements here possessed "substantial indicia of trustworthiness." V.R.E. 804a(a)(4). More specifically, she suggests that DCF's second interview of C.C. on October 29, 2019, tainted all of the subsequent statements that C.C. made to others, with the apparent exception of the February 2020 statement C.C. made to maternal grandfather. Finally, mother argues that the court should have considered the October 29 interview of C.C. as having been taken in preparation for a legal proceeding.

¶ 26. We find it unnecessary to reach mother's arguments. Even without consideration of C.C.'s post-petition hearsay statements, the court's remaining findings amply support its conclusion that C.C. was CHINS at the time the petition was filed. See In re L.M., 2014 VT 17, ¶ 18, 195 Vt. 637, 93 A.3d 553 (explaining that even if court erred in admitting certain evidence, "reversal is appropriate only if the findings of the court, apart from the findings based on the improper evidence, do not support the court's conclusions" (quotation and brackets omitted)); In re D.D., 2013 VT 79, ¶ 34, 194 Vt. 508, 82 A.3d 1143 (reiterating that in juvenile proceedings, trial court's decision will not be reversed, even if some findings are unsupported, "if the remainder of the court's findings, which are supported by the record, are sufficient to sustain the decision" (quotation and brackets omitted)).

¶ 27. As relevant here, a child is "in need of care or supervision" if she is "without proper parental care or subsistence, education, medical, or other care necessary for . . . her well-being." 33 V.S.A. § 5102(3)(B). The focus of the CHINS statute is on the child's welfare at the time the petition is filed. In re B.R., 2014 VT 37, ¶ 14. As part of its analysis, the court may consider the circumstances leading up to the filing of the CHINS petition; the critical question is whether at the time of the filing of the petition, the child was without proper parental care "such that the child's well-being is threatened." In re L.M., 2014 VT 17, ¶¶ 20-21 (quotation omitted). A parent's failure to protect a child from another person can support a CHINS finding. See, e.g., In re J.W., 2016 VT 78, ¶ 24, 202 Vt. 424, 150 A.3d 190 (holding that mother's failure to protect child from

10

individual she believed to be dangerous supports CHINS determination); In re C.M., 157 Vt. 100, 103, 595 A.2d 293, 294-95 (1991) (holding that where mother was aware of danger father posed to child but continued to permit father to care for child by himself from time to time, father's abuse and mother's failure-to-protect supported CHINS finding as matter of law).

¶ 28. Aside from the court's decision regarding post-petition hearsay statements, mother does not challenge any of the court's findings. She does not challenge C.C.'s disclosure to her teacher, which the court found credible and reliable. She does not challenge the court's findings regarding her conduct once she was contacted by DCF. While she tried to justify her response in her trial testimony, the court rejected her explanation as not credible. The court found that without even hearing the details of the allegations, mother defended boyfriend and stated that C.C. was lying. When mother learned the details of C.C.'s disclosure, she again defended boyfriend and said C.C. was not being truthful. She changed the details of her story after learning what boyfriend had told investigators. She said she wanted to interview C.C. Mother said she was awake while C.C. snuggled naked with boyfriend and later acknowledged this was untrue. She was not concerned that her five-year-old child was snuggling naked with her boyfriend, and she went to sleep while this was occurring in her bed. She sought to protect boyfriend, not C.C. The court reasonably concluded based on this and the other unchallenged evidence cited above that C.C. was at risk of harm in mother's care. We find no error in its conclusion that C.C. was CHINS at the time the petition was filed.

Affirmed.

FOR THE COURT:

_____

Associate Justice

11